WEEKS (THOMAS v.). See Case No. 13,-914.

=====

## Case No. 17,355.

### The W. E. GLADWISH.

[17 Blatchf. 77.] 1

Circuit Court, S. D. New York. Aug. 28, 1879.

TOWAGE—NEGLIGENCE—LOSS OF CARGO—BURDEN OF PROOF — ICE — EXCESSIVE SPEED— WEIGHT OF TESTIMONY.

1. A person who ships cargo by a barge which he knows must be towed to her place of destination, is bound by the terms of towage which the barge agrees on with the tug which the barge procures to tow her.

2. If the barge is sunk and the cargo is lost, by contact with ice, while the barge is being towed by the tug, the owner of the cargo must show negligence on the part of the tug, in order to recover against it for such loss.

[Cited in The E. A. Packer, 22 Fed. 670.]

3. It was held not to be negligence in the tug to keep on, after reaching ice. instead of lying by, or making a harbor: that the towing hawser was not too long: that the speed was not too great: that nothing could have been done by the tug to avoid the danger, when the obstruction which actually caused the loss was seen; and that the barge and the vessels in the tow with her were not improperly arranged.

4. To make the tug liable for keeping on, it must appear that the error was one which a careful and prudent navigator, surrounded by like circumstances, would not have made.

[Cited in The James P. Donaldson. 19 Fed. 266; The E. A. Packer. 22 Fed. 671; The Allie & Evie, 24 Fed. 749; The Frederick E. Ives. 25 Fed. 450: The Wilhelm. 47 Fed. 93. Approved in The Battler, 62 Fed. 614.]

1 [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

5. The judgment of witnesses as to speed, formed long after the event, and not based upon anything which specially attracted attention at the time, is rarely to be depended upon.

This was an appeal by the libellant from a decree of the district court, in a suit in rem, in admiralty, dismissing the libel. [Case unreported.] This court found the following facts: "The Eastern Transportation Line, having its office in the city of New York, was engaged in the business of towing boats and vessels for hire, between New York and ports on Long Island Sound, and elsewhere. It was the owner of various tug boats, employed in its business, and, among others, the W E. Gladwish, the F. B. Thurber and the Francis King. The A. W. Humphreys was a barge, or canal boat, owned by her master, James McKeag, and engaged in the business of transporting goods by water, for hire. She had no motive power of her own, but was towed from place to place by tugs employed for that purpose, as occasion required, by her owner. who was an experienced boatman. He had often been towed by this line. At some time before March 8th, 1875, the barge had been towed by one of the tugs of the line from New York to New Haven, under a contract to take her to New Haven loaded, and back light, for fifty dollars.' She had the privilege of bringing back a load, if she chose, and, in that case, was to pay fifteen cents additional per ton for her load. No particular time was specified for her return, but she could come back at any time she was ready and the Line had a tug at New Haven that could take her. She staid at New Haven about four weeks, and, while there, took on board 360 pairs of car wheels, weighing 160 tons, belonging to the libellant, which she agreed to carry to Elizabethport, New Jersey, and there deliver to the Central Railroad Company of New Jersey, 'dangers of the seas excepted,' the consignors paying freight. A bill of lading in the usual form, bearing date February 27th, 1875, was signed by the master and owner. The tug Francis King arrived in New Haven, from New York, with a tow, on the morning of the 8th of March, 1875. She had been detained a long time on her voyage by the ice. which was found very thick west of Norwalk. The King started from New Haven. on her return voyage to New York, in the afternoon of the day she arrived. with a tow consisting of the Humphreys and ten canal boats. The Humphreys only had a load. All the other boats were light. The capacity of the Humphreys was about three hundred tons, but she had on board only the car wheels. She was taken in the tow at the express request of her captain and owner. he selecting that time to go back. under his original contract. When he made his request, he well understood that there was ice in the Sound, and that the King had with much difficulty made her way through it from New York. He took the line from the tug, when the tow was made up. with a full knowledge that he might. and probably would, encounter difficulties from the same cause, on

his way to New York. The libellant took no part in the contract for towage. It was known, however, that the barge must be towed when she did go. The time of starting was left entirely to the barge, though the agent of the libellant was desirous that she should deliver her cargo at its destination as soon as possible, and so informed her captain. The tow was made up. on the start. in two lines, side by side, and towed with hawsers astern. As the Humphreys was loaded, she was placed in the front tier and on the port side. It would have been unsafe, under the circumstances, to have towed her astern of the light boats. No objection was made by the captain of the Humphreys, or any one else, either to the length of the hawsers put out from the King, or to the arrangement of the tow. No ice was encountered, after leaving New Haven, that caused any detention, until some time during the night. The tow was then in the Sound, about opposite Norwalk. After a time, the tow was arranged in single file, the Humphreys still being the forward boat. The King kept on the best way she could, at no time attempting to return or make a harbor. During the 9th of March she sometimes loosened herself from her tow. went ahead and broke a channel. and then came back and took the boats forward in detachments of three or four at a time. At one time the ice was found so heavy and compact that she was compelled to lie by and wait for a change of tide to loosen it. On the change of tide she started again, and worked her way slowly along until about four o'clock in the afternoon, when she was a few miles to the eastward of Execution light. During all this time the weather was fine, without wind, and of a character to soften the ice. On the morning of the 9th of March, the president and superintendent of the Line started out from New York, with the tugs Gladwish and Thurber, for the relief and assistance of the tows in the ice. Some of these tows were on their way east from New York, and the King was known to have started from New Haven. These tugs met the King. to the eastward of Execution light, about four o'clock p. m. They there arranged themselves so that all three should take hold of the tow together. The Gladwish took the lead, the Thurber followed. and then the King. Another hawser was then put out from the King to the Humphreys. and from that time the tugs made the tow with a double hawser. The length of the hawser was not unusual. It was seen and not objected to by the captain of the Humphreys. who was all the time on his boat, steering and watching the navigation. His boat was still ahead, and the tow was still arranged in single file. After the tow was thus made up, the tugs proceeded through channels in the ice, which had been made or formed by steamers on their trips in and out of New York. These channels were generally crooked and of varying widths. from forty feet upwards, filled with broken ice. Sometimes, large cakes of floating ice were found, but, in this particular, it did not differ

materially from what had been encountered before. Shortly after passing Execution light, a small space of open water was found. The ice channel formed by the steamers led into this open space from the eastward, and again out of it toward the west. On reaching this open space, the engine of the King was stopped, and that of the Thurber slowed, the Gladwish only keeping up her full speed. She was the most powerful boat of the three, and still ahead. Not long after the tugs passed out of this open space, and while, perhaps, some of the boats of the tow were still in it, the propeller A. C. Barstow came up from New York. on her way to Providence. Noticing the tugs approaching with their tow, she took the south side of the ice channel. The tugs at the same time went to the north. The propeller, finding a place in the solid ice which had been broken, further to the southward than the general line of the channel, forced herself into that. Between her and the tugs with their tow were large quantities of broken ice, packed together. After she got into this widened space, she put herself against the solid ice on the south and waited for the tow to pass. as it was not safe to attempt to go by in the narrower parts of the channel. While she lay there, the propeller City of New Bedford came along, bound from New York to New Bedford. She passed north of the Barstow and south of the tow, at a speed of six or seven miles an hour. cutting through the packed ice to reach the narrow channel astern of the tow and ahead of the Barstow. While the tow was passing these propellers, the Humphreys was struck in the port bow, a little distance from the stem, by a large cake of floating ice that had in some way been set in motion. A large hole was made in her side by the collision, and she soon filled and sank with her cargo. The tugs were then making their way, with the tow, through the channel, filled as it was with broken ice, at the rate of two or three miles an hour. The engine of the King was not moving and the Thurber was at half speed only. The piece of ice which struck the Humphreys was seen in motion from the King. but the tugs were not stopped. and nothing could then have been done to stop. or change the course of, the ice. so as to avoid the collision. The captain of the Humphreys had been at the wheel. doing what he could to steer her, as she followed the tugs, until just at that time, when he left the wheel-house to go to his supper. As soon as the collision occurred and its effect was known, the tugs were stopped on a signal from the King. and the King, letting go the hawser ahead, backed down to the Humphreys. to render what assistance she could. She had barely time to take off the captain and his family before the Humphreys went down. The other boats in the tow were taken in safety to New York. The tugs were all properly equipped, and navigated by competent and faithful officers and men."

Welcome R. Beebe and John McDonald, for libelant.

Robert D. Benedict, for claimant.

WAITE, Circuit Justice. The contract for the transportation of the car wheels was between the libellant and the barge only. The tugs are in no way responsible to the libellant for the performance of that contract. Their liability is under their contract of towage only, as to which the libellant is bound by the terms agreed on by the barge. As it was known, when the cargo was shipped, that the barge would be towed to her place of destination, the shipper, in the absence of anything to the contrary, is presumed to have left the time and the manner of the towage to the discretion of those in charge of her navigation.

There can be no recovery in this action except for negligent or unskillful towing. The tugs did not, by their contract, insure the safe delivery of the cargo at the end of their route. Their agreement was to tow the barge, and, in so doing, to use such care and skill as a prudent man would exercise, under like circumstances, in the management of his own business. The law implies that their care and attention were to be in proportion to the dangers encountered and the consequences of neglect. This is but common prudence. The greater the risk, the greater should be the effort to avoid it. The burden of showing negligence is on the libellant. The mere fact of sinking the cargo is not enough. Actual fault, contributing to the loss, must be proven.

The specific allegations against the tugs are, in effect, (1) that they kept on, after reaching the ice, without lying by, or making a harbor; (2) that the hawsers between the King and the Humphreys were too long for safety; (3) that the speed was too great when the collision occurred; (4) that, when the obstruction which actually caused the loss was seen, the tugs were not stopped and no efforts made to avoid the danger; and (5) that, after the Gladwish and the Thurber arrived, the tow was not divided and a part given to each tug to take on by itself. These will be considered in their order.

(1) As to not making a harbor. The master of the barge, by electing to go back with the King, when he knew that ice would probably be encountered on the way, in legal effect assumed, for the barge and her cargo, all the risks of towage in the ice, not caused by the neglect or unskillful navigation of the tugs. The contract was for such a degree of caution and skill as was required for towage under such circumstances. There was no obligation to return to New Haven, or seek some other harbor of refuge, simply because ice was found in the way. All parties anticipated, when they started, that ice would be found, and that, for some part of the distance, the dangers incident to towage under such circumstances would be encountered. The object was to get through such ice as they might meet, not to wait for it to melt. The tugs undertook to bring to this work such prudence and such nautical skill as was ordinarily required in such navigation. More was not contracted for, and more was not expected.

When the ice was reached, it became necessary to decide whether to lie by or go on. This involved the exercise of judgment as to what ought to be done under the circumstances. A mere mistake is not enough to charge the tugs with any loss which followed. To make them liable, the error must be one which a careful and prudent navigator, surrounded by like circumstances, would not have made.

The facts are, that the weather was fine, the sun warm, and the ice apparently yielding. There was no wind, and nothing seemed to be in the way of going on but the melting ice, much broken, and with many openings through which the tow might, to all appearances, be taken in safety. The King, which was then alone, had come through the same or like obstructions the day and night before, with a tow of loaded boats, and there was nothing whatever to indicate that a return voyage, with the tow taken on at New Haven, might not be made with equal safety. Propellers and steamboats had been for some time passing and repassing without serious damage, and every day the navigation seemed to be improving. In view of these facts, I cannot believe that ordinary prudence required an abandonment of the voyage for the time being, by lying up, or seeking a harbor. The tug was commanded by a competent master, and the captain of the barge was an experienced boatman. No objection was made by any one to going on, and it is evident that no person connected with the tow considered it necessary to stop. The progress made was slow and difficult, but all seemed to think there was no way but to keep on and do the best that could be done.

(2) As to the length of the hawsers. It is not easy to tell, from the evidence, precisely what the length was, but that it was not at the time believed to be unsafe or unnecessarily long is shown by the fact that no one complained of it before the accident. And, in this connection, the conduct of the master and owner of the Humphreys must not be overlooked. He had long experience and had been often towed through the Sound. His barge had been the head boat from the start. He had been watching the progress of the tow from the time it came into the ice. He was in a position to see if there was anything wrong either in the arrangement of the boats, or the management of the tug, and, it is impossible to believe, that, if he had considered the hawsers too long, he would not, in some form, have made known his dissatisfaction. I am satisfied, from the evidence, that the length was not materially increased after the Gladwish and the Thurber took hold; and, down to that time, the hawser had certainly done its work well. All the boats had been brought in safety a long distance, through crooked channels and difficult passages. Under these circumstances, it seems to me clear, that there could have been no such error in judgment, in this particular, as to make the tugs liable.

(3) As to the speed. It is impossible to say at what precise rate the tow was moving, but

it is certain that the engine of the King was stopped, and that of the Thurber slowed down to half speed; that the Gladwish found it difficult to use her full power, on account of the choking of some part of her machinery by the ice; that the channel, most of the way, was narrow and filled with broken and floating ice; and that the tide was against the tow. With all these difficulties, it seems to me impossible that the general speed at the time was such as to be unsafe. The judgment of witnesses in such matters, formed long after the event, and not based upon anything which specially attracted attention at the time, is rarely to be depended upon. It is always safer to look at the facts as they are known to have occurred, and judge from them.

(4) As to avoiding the ice that inflicted the injury. After a careful consideration of all the evidence, I am satisfied the collision which caused the loss was not with fixed ice, but with a large cake of ice which was itself in motion. The accident happened while the tow was in the vicinity of the propellers Barstow and City of New Bedford. Precisely how far they were away, is left somewhat in doubt, but, notwithstanding some conflict in the evidence, it seems to me clear that the intervening ice was not solid or stationary, but broken and floating. There undoubtedly were large pieces mixed with the mass, but none of it was what could be denominated fixed ice. The Barstow, until she came to a full stop, was working her way along and up against the solid ice. This would not have been necessary, if, as is contended, there had been a large field of solid ice, two or three hundred feet in width, between her and where the tow was to pass. The City of New Bedford passed the Barstow and the tow, by working her way through the intervening ice to the channel the tow had left. This indicates, beyond all doubt, that, while the pieces may have been packed closely together, the mass was not solid. Such being the case, it is easy to see, that a propeller, in passing along, would set the pieces, to some extent, in motion. Either the propellers or the tow had to move, in order to get by. When the Barstow first came up, some portion of the tow was in the narrow part of the channel, where it was unsafe to undertake to pass. The wide part of the channel, where she was lying by, was not very long. In the language of some of the witnesses, it appeared as though an opening had been made there for boats to pass. To get out of the way, she worked herself up against the solid ice. In the meantime, the tow was passing, and, when the City of New Bedford came along, it had got so far out of the narrow channel beyond, that she deemed it safe to keep on without stopping. The Barstow was willing to let her get by, as she was a larger and stronger vessel, and better fitted for opening the way, and the Barstow could follow in her wake. It is not possible to tell, from the evidence, precisely when, or where, or how the piece of ice which inflicted the injury was set in motion; but it is clear to my mind, that it was connected in some way with the movements of one or the other of these propellers. The testimony is so conflicting as to make it impossible to locate the propellers with reference to the tow at the time the collision took place, or to determine precisely what the Barstow was doing; but it is certain, that the City of New Bedford was moving somewhere in the vicinity, at a speed of six or seven miles an hour, and that, at some time not long before, the Barstow had been working her engine so as to get away from the tow as it was approaching. There was no other known cause for the displacement of the ice at the time, and the conclusion is, therefore, irresistible, that it must, in some way, have been done by the propellers. At this time, the tugs were moving cautiously, and there was nothing to indicate danger from the quarter it came. So far, I can see no fault in the management of the tugs.

The moving cake of ice which inflicted the injury was seen from the King before the collision took place, and it only remains to consider whether the tugs were in fault for not avoiding it after this discovery was made. There was not time enough, after the discovery, to stop the Humphreys altogether, and it does not seem to me that the additional headway produced by the tugs not stopping, was sufficient to cause the loss. If the tugs had been stopped, it is likely the result would have been the same. The only thing to be done was, if possible, to turn the ice away from the barge, or the barge from the ice. It will scarcely be contended that there was time enough to do this, from the tug. The ice did not come within reach from her, and, even if she had been loose from the other tugs, she could not have backed down soon enough to do any good. If the captain of the barge had been at his wheel, he might possibly have been able to steer away from the approaching danger; but, unfortunately, he had just at that moment been called to his supper, and was not in a place where he could attempt any such movement. For this, certainly, the tugs are not responsible, and, on the whole, I have been led to the conclusion that the tugs are free from blame under this allegation of fault.

(5) As to not dividing, and, in this connection may be considered the further complaint, presented on the argument, that, when the three tugs were brought together, no one man was placed in command of the whole.

Neither of these complaints is set forth specifically in the libel, and I cannot find that they are at all supported by the evidence. Certainly, some one person should be put in command, and the presumption is that this was done. Not a particle of evidence is found to the contrary. In the absence of such evidence, the law implies that what ought to be done was done.

So far as dividing the tow is concerned no witness has been examined on the subject, and the complaint seems to be based on theory rather than proof. It is certain the tow was not divided; but, in the absence of any testimony showing that it ought to have been done, I cannot hold that the judgment of the experienced men who acted on the facts as they actually ap-

peared at the time, was so clearly wrong as to make it a fault. Towing in sections would not be likely to reduce the speed. True, each tug might in that way more easily control its own movements; but it is far from certain that this, under the circumstances, would have been an equivalent for what must necessarily be lost by the change. The difficulty was in overcoming the obstruction of the ice. By keeping together, the power of all the tugs could be combined, and a longer continuous channel kept open. But, however this may be, there is nothing before me to show that keeping together was a fault.

On the whole, I am of the opinion that a case has not been made out against the tugs, and that the decree below, dismissing the libel, was right.