## The E. A. Packer, etc.

### (District Court, S. D. New York. December 1, 1884.)

1. Tug and Tow—Use of Several Boats—Lien.

    Upon a contract with the owner of a line of several tug-boats, for towage, by separate stages, the contract not specifying the use of any particular tug-boat, and several being employed at the different stages of the trip, *held*, that the one last appropriated to this service was not liable *in rem* for any previous delay before she was assigned to her particular part of the service.

2. Same—Ice—Negligence.

    Though on a contract for towage through ice a tug is liable only for negligence in executing the contract, and not for starting upon such an undertaking, yet, where a contract does not contemplate the special dangers from navigation amid ice, the tug-boat is answerable as for negligence if she starts at an improper time, and in the face of known danger from ice; and where both captains concur in such an undertaking, without the consent of the owner of the tow, both are answerable for the loss.

3. Same—Joint Negligence.

    The tug and tow in this case being unable to go through a pack of ice in the Raritan river, having returned and met a large field of thin meadow ice, which both concurred in undertaking to go through, without previous breaking up, *held*, negligence in both, for which both were liable.

In Admiralty.

*Hyland & Zabriskie*, for libelant.

*E. D. McCarthy*, for claimant.

Brown, J. Libel to recover for damages sustained through the sinking of the canal-boat Enterprise, from being cut through by ice in Newark bay, on the eighth of February, 1883, while in tow of the steam-tug Packer. In December, 1882, the captain of the canal-boat, the husband of the libelant, contracted with Mr. Scully, the owner of a line of tug-boats, of which the E. A. Packer was one, for the towage of the Enterprise from Brooklyn to Cheesequoke creek, where she was to be loaded with poles, and thence, after being loaded, to be towed to Newark, New Jersey. The captain, at the time, paid $35, the price agreed on for the whole trip. The next day the canal-boat was towed to the creek by one of Mr. Scully's tugs, and had got loaded with poles by December 31st. A few days after, a small tug took the canal-boat as far as South Amboy, and there left her. In two or three days more the tug Mary Ann came and towed the canal-boat as far as Elizabethport, where she was left until the eighth of

February. On the morning of that day, the libelant's captain having previously complained that he was unnecessarily detained, the pilot of the E. A. Packer went with his tug to the canal-boat, and, according to the defendant's testimony, advised against the attempt to go to Newark, on account of the ice.

The captain testifies that he submitted the matter entirely to the judgment of the pilot of the Packer, but the weight of evidence is certainly to the effect that the captain of the canal-boat said he would take the risk if the tug would do as he wanted. The tide was then flood, and no ice was in sight along the channel way of the bay. The tug thereupon took the canal-boat along-side, and proceeded several miles without encountering any ice, until two or three miles above the central bridge, when, reaching the lower part of the dyke, where the Passaic is narrow, a dense pack of ice was encountered. Some three or four steam propeller barges and tugs were ahead of the Packer, and, before entering the ice, the canal-boat was put astern and fastened by a hawser about 8 feet in length. It was proposed to follow, if possible, in the wake of the barges and tugs ahead. After entering 100 or 200 feet in the pack, they were unable to proceed further, as were also the boats ahead of them. While lying there the steam-tug Mackin passed on the port side of the canal-boat, and worked in directly ahead of the Packer, and there remained fast. Shortly after, some momentary excitement was occasioned by the captain's assistant on the canal-boat exclaiming that she had been injured in her port quarter, and was leaking. The injury was ascribed to the passage of the Mackin, but it proved to be trifling. The weight of testimony is that the captain at that time, or soon after, expressed his regret that they had left Elizabethport, and desired to be taken back. The Packer immediately proceeded to return. They had been at this time from an hour to an hour and a half in the ice. It was nearly high water, and with the ebb-tide the pack of ice above would be carried down into the bay below. The return of the Packer was through clear water. Shortly before reaching the central bridge, a large field of meadow ice was encountered, 500 or 600 yards long, about the same width, and from half an inch to two inches thick, which had been blown by the wind from the flats along the shore, and lay directly between the Packer and the draw of the bridge, through which it was necessary for her to pass. The Packer steamed ahead slowly under a single bell. In entering and ploughing through this field of meadow ice, in order to reach the draw, she had not proceeded more than two or three hundred feet when the starboard bow of the canal-boat was cut through by the ice, and she was beached as soon as possible.

On the trial one of the grounds of the libelant's claim was that the canal-boat, under the contract, was entitled to a safe towage to Newark, and that the Packer, having delayed in taking her until an improper time, was liable for this delay, and for taking her at this un-

toward season of the year, instead of earlier, before any ice had formed
in the river. It was ruled on the trial, and I think correctly, that
the Packer was not liable *in rem* on that ground, inasmuch as the
contract with Scully, the proprietor of the line, was a general contract
for towage services, not having reference to any particular vessel, and
that for damages for such delay he only was liable *in personam*. The
obligation of the Packer, however, began from the time she was ap-
propriated to this service and commenced her duties. Her duties
from that time were such as were imposed by the contract made in
December previous. That contract was not a contract made specially
with reference to the dangers of navigation in ice, as in the cases of
*The Alfred and Edwin*, 7 Ben. 137, and *The W. E. Gladwish*, 17
Blatchf. 77, but for navigation under ordinary conditions; and her
obligations were the ordinary obligations for due care and skill on her
part, in effecting a safe passage, including the duty to undertake it in
suitable weather only. Under the original contract the Packer had
no right to start out, and cannot be excused from negligence and want
of due care in starting out with the canal-boat, when the pilot knew
the attempt would be dangerous.

There can be no doubt that the attempt to go to Newark on the
eighth of February was a hazardous one. Although no ice was vis-
ible in the bay from Elizabethport, the pilot of the Packer well knew
that there was thick ice in the river above; and the captain of the
canal-boat, who had been at Newark the day before, though not by
river, must also have known there was ice, and was informed of it by
the pilot. He was impatient, however, to make the attempt; and,
as I have said, the weight of evidence is that he agreed to take the
risk. Some of the witnesses for the defendant add that the captain
stated, when saying he would take the risk, that he was the owner of
the boat. This was untrue, and was emphatically denied by the cap-
tain; and I am not disposed to accept this part of the defendant's
testimony. There is no suggestion that the pilot of the Packer sup-
posed the captain was the owner of the cargo.

In the case of an independent contract to tow a boat through ice,
or of a contract deliberately made with reference to such circum-
stances, a tug would not be held liable for starting upon such an un-
dertaking; but only for some negligence, or want of due care and skill
in the execution of it. *The Alfred and Edwin* and *The W. E. Glad-
wish, supra.* This case is not, I think, equivalent to such a contract.
The Enterprise, under the original contract, was entitled to safe trans-
port, so far as due care in selecting the time for starting and for con-
tinuing the trip could insure it. The contract was for towage in ref-
erence to the ordinary conditions of safety. The price for the entire
towage to Newark had been paid. The circumstances altogether do
not indicate any intention to make a fundamentally new contract.
Both parties were aware of the original contract, and I doubt whether
the captain can be deemed to have had any authority to revoke it,

and to make a new one to be towed through the ice solely at his own risk. The captain denies that he made any such undertaking at all, and it certainly could not have been understood as a wholly new contract by the pilot of the Packer. No new compensation was to be paid. At most, then, the case would seem to be one in which the tug and the captain of the canal-boat agreed to venture upon a hazardous undertaking by setting out at an improper time in the discharge of the original contract of towage. Both knew, or ought to have known, that the attempt was dangerous, and at the peril of the boat and cargo, and both concurred in the attempt. In this point of view the cases of *The William Murtagh*, 3 FED. REP. 404, 17 FED. REP. 259, and *The William Cox*, 3 FED. REP. 645, 9 FED. REP. 672, would seem to be applicable, and each party must therefore be charged with one-half of the loss.

If, however, the voyage were regarded as, in effect, made upon a new contract for towage, amid the hazards of expected ice, at the master's risk, still, in the language of WAITE, C. J., in the *W. E. Gladwish*, 17 Blatchf. 77, 83, "the contract was for such a degree of caution and skill as was required for towage under such circumstances. * * * The tug undertook to bring to this work such prudence and such nautical skill as was ordinarily required in such navigation. More was not contracted for, and more was not expected. * * * To make her liable, the error must be one which a careful and prudent navigator, surrounded by like circumstances, would not have made. The master of the barge, in legal effect, assumed for the barge and her cargo all the risks of towage in the ice not caused by neglect or unskillful navigation of the tug." Judged by this standard, I find no negligence or want of skill or caution in the Packer, until upon her return she encountered the field of floating ice. The libelant's witnesses testify that they thought it would have been safer for the Packer to have maintained her position in the ice near the dyke until the ebb-tide had loosened it, and enabled the barges and tugs ahead to proceed and the Packer to keep on in their wake. This is evidently a judgment formed after the event, and is entitled to little weight. It involved perseverance in a dangerous attempt; would have subjected the Packer to all the dangers of thick ice coming down with the tide, and to the probable chance, and even the great likelihood, that the Packer would be unable to keep so near to the barges ahead as to derive any protection from them.

I am satisfied that the most prudent course, the bay being apparently clear below, was to do what the Packer did, with the evident concurrence of the libelant's captain, namely, to attempt to return. This appeared to be without danger. When the large field of ice, however, was encountered below, it seems to me to have been the clear duty of the Packer to attempt to break a passage through, before entering it, and subjecting the canal-boat to its cutting pressure. Such precautions are usual where any dangerous ice is encountered.

These precautions were taken in the case of *The Gladwish, supra.*
One reason now suggested for not having adopted them in this case
is that the tide was already ebb, and any delay might have been fol-
lowed by a crush of ice from above.   Had this been the real reason,
the pilot of the Packer would naturally have consulted the captain
of the canal-boat, considering the alleged agreement to go according
to his directions, as to which of these alternative risks he would take.
It does not appear that any ice from above was in sight.   The cap-
tain was not consulted; neither did the captain, as he had the op-
portunity to do, and as he ought to have done if he intended to object
to it, make any objection, or require the ice field to be broken up
first.   Both were negligent in this matter.   The Packer had already
several miles the start of the thick ice above.   A short time would
have sufficed for at least something to have been done in aid of the
barge by breaking up the thin field which lay between her and the
draw.   The failure of the Packer to do anything to avert this im-
mediate and present danger is not answered by the mere apprehen-
sion of a more remote danger behind.   From either point of view,
the Packer must be held also in fault, and must be charged, therefore,
with one-half of the damages to the boat and cargo, with costs.