## The Allie & Evie.

### Philadelphia & R. R. Co. *v.* The Allie & Evie and others.

*(District Court, S. D. New York. August 2, 1885.)*

1. **Tug and Tow—Sudden Squalls—Cutting Adrift—Dropping Astern.**

   The tug A. & E., at South Amboy, New Jersey, took in tow two coal-barges, along-side, to go some 18 miles across the lower bay of New York harbor, and thence about six miles up the shallow Shrewsbury river to Red Bank, on an established line for towage. When about two-thirds of the distance to the Shrewsbury river, a sudden and violent squall raised a high sea that caused the boats to pound so much that they were cut adrift, after the captain's refusal to remain aboard of them to steer if dropped astern on a hawser, for fear of being washed overboard. The evidence was that, without a helmsman aboard to steer, the barges could not have been saved in such a wind and sea even if dropped astern; that the A. & E. was built to run upon this service; that she was competent to handle such barges in any weather ordinarily to be expected on such trips; and that the usual course, and usual precautions, were observed. *Held,* that the tug was reasonably sufficient for the work undertaken, and not liable for the loss of the barges because she did not drop them astern when the squall was approaching.

2. **Same—Weather on Starting—Barometer—Cautionary Signals.**

   A low but rising barometer, and cautionary signals displayed, are not alone sufficient to make starting on such a trip negligence, in the absence of all other indications of bad weather.

3. **Same—Reasonable Sufficiency for the Trip—Custom.**

   Tugs, not being insurers, are liable only for lack of reasonable prudence, judgment, and skill; and as regards the adequacy of the tug, the fitness of the weather on starting, as well as regards seaworthiness in general, the question is a practical one of reasonable sufficiency for the particular trip in the judgment of skillful and prudent navigators, and on this question the customs of the time and place are competent evidence.

4. **Same—Reasonable Skill in Use of Customary Methods.**

   Where a tow is sent to be towed upon an established line whose methods of towage are known, and these methods are not in themselves unjustifiable, the contract implied by law is for the use of all reasonable judgment and skill in the use of these methods; and if there is no fault in this respect, the tug is not liable.

In Admiralty.

*Mitchell & Mitchell,* for libelants.

*Wilcox, Adams & Macklin,* for claimants.

Brown, J. This libel was filed to recover about $4,800 for the loss of two coal-barges, with their cargoes, on the night of December 14, 1883, which were cut adrift during a squall in the lower bay while the boats were in tow of the tug Allie & Evie, on a trip from South Amboy to Red Bank, on the Shrewsbury river. The barges belonged to the libelants, and had taken on board cargoes of coal at Schuylkill Haven, Pennsylvania, consigned to Miles Ross, Red Bank, New Jersey, for which bills of lading were given "excepting the dangers of navigation." Arriving at South Amboy, the boats were taken in charge by the Pennsylvania Railroad Company, which had a towing line making regular trips to Red Bank, which is some five or six miles up the Shrewsbury river. This river is narrow and shallow, and can only

be navigated with such barges at or near high water, and only light-draught tugs can be used in such service.    The distance from South Amboy to the mouth of the Shrewsbury is about 18 miles, and the course lies across the lower bay, where a high wind soon raises a sea that is dangerous to any but ocean-going vessels.    The tug-boat Allie & Evie had been constructed for this line the spring previous, and had made some 13 trips before the present.    She usually took two boats along, one on each side, and the weight of evidence is that she was competent to handle such a tow, except in a high sea.    Around South Amboy she could manage four or five such boats, and since this loss in 1883 she has continued in the same service without accident.

Upon this trip the Allie & Evie left South Amboy, as customary, at high water, which, on that night, was at 8 : 30 P. M.    The libelants' boats were lashed one upon each side, as usual.    A larger steam-tug, the Harry, of the same line, having no employment, was directed to accompany and assist the Allie & Evie a part of the way.    She did so for nearly two-thirds of the distance to the mouth of the Shrewsbury river, when she cast off and returned to South Amboy.    One of the libelants' witnesses says that when the Harry left there was a drizzling rain, but that the sea was calm and smooth.    Several other witnesses say that it was then clear above, with the stars shining, and that there were no indications of the approach of bad weather.    About half an hour after, and a little before 11 P. M., black clouds gathered suddenly in the west, the wind increased rapidly to a gale from the north-west, the sea rose, and the two barges, whose bows projected far beyond the tug, soon began to pound the tug, and became so displaced through the breaking of some lines as also to strike each other's bows.    It then became apparent that the barges must be cut loose.    The persons aboard of them came on board the tug, and the barges were cut adrift and lost.    Before casting them off, some conference was had between the pilot of the tug and the captain of one of the barges, the only person aboard of that boat, about dropping the boats astern upon a hawser; but the captain refused to remain on board the barge if dropped astern, for fear of being washed overboard.    The other captain was, in the mean time, getting his family aboard the tug.    On the trial both the captains testified that they would not have consented to stay aboard; they assisted in cutting their boats adrift, and they both, with other experts of the libelants, as well as the respondents' witnesses, agreed that it would have been of no use to drop the barges astern on a hawser without men aboard to steer them.    The Schuylkill boats are not easily managed on a hawser, and they steer badly.

Unless the testimony of all the boatmen is discredited, the squall was a very violent one; the sea dangerous; and the tug in peril, even after the barges were cut adrift.    The two captains did not expect to reach the shore alive.    The pilot was alarmed for his safety.    The waves washed over the pilot-house, the bulwarks of the tug were cut

away to ease her and let the water out, and when she got under the lee of Staten island she had three feet of water in her, reaching nearly to her fires.

It is not claimed that the respondents were insurers; but upon the rule laid down by the supreme court in the case of *The Margaret,* 94 U. S. 494, 496, that "the tug is the dominant mind and will in the adventure;" that "she is bound to bring to the performance of the duty she has assumed reasonable care and skill, and to exercise them in everything relating to the work until it is accomplished"—it is urged that the respondents are liable for this loss, (1) because the Allie & Evie was not a fit and proper tug for the work that she undertook; (2) because the barometer and cautionary signals displayed in New York indicated dangerous weather for some considerable time before she started out, and that the tug was not justified in starting; and (3) because the tug Harry returned sooner than she ought, and because, had she kept by, each tug, as it is claimed, might have saved one boat.

In regard to the last point, notwithstanding some reluctance to give full credit to the testimony that it was impossible to save either barge if dropped astern on a hawser unless there were a man aboard to steer her, the weight of evidence is so strong on both sides upon that point that I am not at liberty to disregard it. If that be so, even if the Harry was not justified in returning when she did, I do not perceive how remaining by could have made any difference in the result, as it is clear that neither of the captains was willing to remain aboard his barge to steer her. The early departure of the Harry, therefore, must be held to be immaterial as respects this loss, because there was no service that she could have rendered, except to take one boat astern on a hawser without any helmsman aboard, and that, according to the evidence, would have been ineffectual. But the weight of evidence is that there were no indications of bad weather when the Harry left the other tug some seven miles distant from the Shrewsbury river; and, considering that the use of two tugs was not customary, I cannot hold it negligence, or want of reasonable care, for her to return under such circumstances, without holding these trips, though made in the customary manner, to be wholly unjustifiable.

Even if the pilot of the Allie & Evie might have thought that the men could safely stay aboard, though he evidently did not think so, he had no lawful command or arbitrary power over the captains of the barges,—such as the captain of a vessel has over the seamen under him,—and he is not responsible for the conduct of the captains any further than they choose to comply with his requests or directions. *Sturgis* v. *Boyer,* 24 How. 110; *The Express,* 3 Cliff. 462; *The James P. Donaldson,* 19 Fed. Rep. 264. Here the pilot proposed to drop the barges astern, the captains refused to remain aboard, and that seems to have been taken as settling the question that the barges must be cut adrift; and upon the evidence I must find it rightly so determined.

It is argued that the barges should have been dropped astern on the first signs of the squall. This might possibly have been done with the men still on board. But their testimony on the trial was that in their judgment they would, in that case, have been certainly washed overboard and all lost. Upon that testimony of the libelants' witnesses I cannot find it to have been a fault in the tug that she did not pursue that course, even if there was time for it, after it became probable that there would be danger to the boats in keeping along-side; and it is not clear that there was time after the extent of the danger became apparent.

That the Allie & Evie was not competent to handle and save this tow in the sudden and violent squall that sprung up, is plain from the result. But upon the evidence above referred to it must be held that the Harry, and probably any other tug, would have been equally incompetent. The difficulty did not spring from lack of power in the tug, but from the unavoidable dangers of the route. No tug can tow barges along-side in a high sea. They must soon founder from pounding; and if the sea is too high to permit men to remain on the barges to steer, and if such boats, though on a hawser, could not be saved without being steered, as would appear from the evidence, then there is no alternative in such an emergency but to cut the boats adrift.

Navigation cannot escape dangers. If it could, there would be no place for insurers. There are very certain and very peculiar dangers that attend navigation on such a route as this,—a route that combines the navigation of a shallow river with a passage of from 12 to 15 miles across a broad bay liable to high and dangerous seas in sudden squalls, with boats that, if the testimony is to be credited, are unmanageable under such circumstances. All that can be done in such navigation is to take every reasonable precaution that prudence and good judgment can suggest,—precautions proportionate to the dangers involved,—and to start out only when there is no reasonable probability of bad weather. Upon this point the witnesses on both sides agree that when the tug started from South Amboy there were no recognizable signs of bad weather. The barometer was, indeed, low, though it was rising towards evening; cautionary signals had been displayed in New York since the morning; and these signals continued to be displayed for two days. These facts, however, were not known to those in charge of the line at South Amboy, although they might have been ascertained by telegraphic inquiry, and also through Mr. Chace, the general superintendent of this department of the respondent's business. But a low though rising barometer, and the display of cautionary signals, are not alone, in my judgment, so certain indications of bad weather that trips of a few hours' duration only must be condemned, where all the ordinary signs visible to experienced and practical seamen indicate safe weather for the trip. No experts were called to testify that the starting out was improper under the circumstances. If such short trips were condemned by law,

as lacking ordinary prudence, on account of the mere possibility of danger suggested by the barometer and cautionary signals, in the absence of any other unfavorable indications, much of the towing business of this harbor must often come to a standstill for a considerable period, except at the risk of the tugs as insurers. Clearly, that is not the practice; nor is it the fair import of the contract of the parties in taking such boats to tow. Practices, or so-called customs, that are at variance with the obligations that the rules of law impose, are indeed void, and afford no defense. *The Wm. Murtaugh,* 3 FED. REP. 404. But there is no rule of law, and I am not prepared to hold, that short towing trips must be condemned so long as the barometer is low, though rising, and cautionary signals are displayed, in the absence of all other indications of probable bad weather.

The requirements of law are substantially the same, both as to the adequacy of the tug for the work assigned her, and as to proper weather for starting out; and it is the same that is applied to seaworthiness in general, viz.: reasonable sufficiency for the particular trip or voyage, according to the judgment of persons versed in the business. The defense of unseaworthiness is not made out by showing that "a stouter ship might have survived the peril." *Amies* v. *Stevens,* 1 Strange, 128. The law does not require a vessel, to be seaworthy, to be capable of withstanding every peril; nor that a tug be capable of rescuing her tow in all weather; nor that she shall start only when there is no possibility of danger; nor that the master in an emergency shall infallibly do that which, after the event, others may think would have been best. *The Hornet,* 17 How. 100; *The Star of Hope,* 9 Wall. 230; *The W. E. Gladwish,* 17 Blatchf. 77, 83; *The Mohawk,* 7 Ben. 139. The tug must be reasonably adequate for the work undertaken; managed with reasonable judgment and nautical skill; and she must start only in weather that in the judgment of nautical men is reasonably safe for the trip. In whatever form the question comes up, whether as to seaworthiness, adequacy for the work, or the time of starting, it is a practical question of reasonable prudence and judgment. And as regards seaworthiness in general, or the adequacy of the tug for the work undertaken, there is no other final criterion than the judgment of practical men versed in the business and the customs and usages of the time and place, viewed as representing the judgment and knowledge of the time. To show this, the custom and practice of nautical men is admissible. See *The Titania,* 19 FED. REP. 101, 105–109, and cases there cited. The exercise of reasonable prudence and judgment, measured by this standard, does not exclude some remaining maritime risks. Against these risks it is the province of insurers to provide; otherwise, the shipper is his own insurer.

In the present case the consignee had telegraphed to the respondents: "Please send the Red Bank boats down to-night, if possible; the Shrewsbury may freeze up any day." In the judgment of the two

captains who were the libelants' witnesses, as well as in the judgment of all the other witnesses who testified on this point, there was nothing apparent in the weather that should deter them from starting. Had they not started, and had the Shrewsbury frozen up the next day, a claim of damages might have been interposed. All the usual precautions were taken. No similar accident on this line has occurred, either before or since. The same tug has been in use, and in the same way. No witnesses have expressed the judgment that the weather was unfit for starting. The evidence shows that the Allie & Evie was built for this express purpose; that she was adequate to handle the tow in any ordinary weather that was to be expected. I am not prepared to hold these trips unjustifiable in law on account of their peculiar dangers, and the evidence does not clearly establish any actual negligence or want of reasonable care; and even the loss that subsequently happened arose, as it seems probable, not from anything indicated by the barometer or the cautionary signals, but from a sudden squall from the north-west, quite probably wholly independent of the conditions indicated by the long-continued signals and barometric observations. The libelants, moreover, were as familiar with the sea perils of the route as the respondents were. As the line was an established one, and in use by the libelants, it cannot be doubted that they were acquainted with the means of transportation employed and the modes of navigation. Under these circumstances the contract of the parties implied by law was for the exercise of reasonable prudence, judgment, and skill in towing the barges according to the customary methods and usages of the line.

I think this loss was one properly to be ascribed to the perils of navigation, in a sudden squall, not reasonably to have been anticipated; and not to inadequacy of the tug, or to want of reasonable skill or judgment, either in not keeping out of danger, or in avoiding it when it overtook them. *The Geo. L. Garlick,* 20 FED. REP. 647; *The James P. Donaldson,* 19 FED. REP. 264; *The Charles Allen,* 23 FED. Rep. 407. There must, therefore, be judgment for the respondents; but costs will not be awarded against the receiver.