## The Wilhelm.

### Vance *et al. v.* The Wilhelm.

#### (*District Court, E. D. Michigan.* March 25, 1891.)

1. **Towage—Liability of Steamer—Negligence.**
   A propeller having a schooner in tow made a trip on Lake Huron at the very end of the navigation season. On passing a certain harbor, the weather gave indications of a storm, but the propeller kept on her course. The storm soon grew to be one of unprecedented severity, and, while the vessels were near a lee shore, the tow-line broke, and the schooner was wrecked. *Held,* that the act of the master in keeping on his course in such an emergency was not negligence.

2. **Same—Master's Decision.**
   Where circumstances are evenly balanced, which indicate a choice of action in time of danger, the master's decision in the matter of navigating the vessel is conclusive, and, although he may err in judgment, it is not negligence, if the master be competent.

3. **Same—Test of Negligence.**
   Hypercritical scrutiny into the conduct of the navigation, after the event of the disaster and in the light of that which has happened, is not the test of negligence, but prudent judgment is to be tested by the circumstances as they appeared to the master at the time he was called to act, and not as they appear to the court after the more critical scrutiny than the master could have given to them.

In Admiralty.

On November 26, 1889, the propeller Wilhelm, with the schooners Mears and Midnight in tow, all lumber laden, left the port of Cheboygan, Mich., bound to Tawas. At 4 A. M., November 27th, the tow passed Thunder Bay light, at which time the weather was unsettled, wind from the eastward, and sea moderate. About 7 o'clock the tow was struck by a heavy squall from about E. N. E., accompanied by snow, and from that time until the loss of the barges on Fish point, at about 2 o'clock P. M., the wind blew a gale from E. N. E. to N. E., accompanied by frequent violent snow squalls and a heavy sea. About 9 A. M., when off Sturgeon point, the Wilhelm lost her starboard deck load, causing her to list so much to port as to interfere with her steering, at which

time a cast of her lead gave six fathoms of water. Whereupon she rounded to and headed the wind, until her cargo was trimmed to right her, when she went off upon her course, which was a little to windward of the usual running course for Tawas. About 1:30 P. M, a cast of the lead gave six fathoms. A blinding snow-storm was then raging, and the master of the Wilhelm, deeming himself far enough to the southward until he could ascertain his exact position, decided to haul into the wind, and hold there, until it broke so he could pick up the land. After rounding to, and while holding head to wind and sea, the line between the Mears and Wilhelm parted, and both schooners were driven on shore near Fish point, and became total wrecks. The owners of the Mears file their libel against the Wilhelm, charging as the cause of their loss negligent management in the following particulars: (1) In that said propeller attempted to tow said schooners Mears and Midnight across Lake Huron during a violent and increasing storm, without regard to the condition of the weather existing after passing Thunder Bay light, instead of taking said tow to a near, accessible, and safe shelter in Thunder Bay, as she could have done without difficulty, and was required by ordinary care and seamanship. (2) In negligently failing to come about and hold her said tow head to wind and seas after the loss of her deck load. (3) In negligently hugging the west shore of Lake Huron in a thick, driving snow-storm, with a heavy wind and sea from the eastward. (4) In negligently turning at full speed into the lake so sharply as to part the tow-line to said Mears, whereby said schooner was necessarily rendered helpless, in such close proximity to a lee shore that her destruction was inevitable.

*H. D. Goulder* and *H. M. Gillett*, for libelants.

*H. C. Wisner* and *F. H. Canfield*, for respondents.

HAMMOND, J., (*orally, after stating the facts as above.*) Notwithstanding the voluminous proofs in this case, the facts upon which the decision must turn are quite simple. The libelant's vessel was lost in a storm described as the most furious which ever occurred on Lake Huron, that of November 27, 1889. It was in tow of the respondent's steamer Wilhelm, and after the parting of the tow-line, while the storm raged, was driven ashore near Fish point, becoming a total wreck. On the face of it, it would seem that the perishing of a vessel in such a storm was one of those inevitable disasters chargeable to the perils of navigation; an act of God, for which none could be responsible; and a loss by a risk which all take "who go down to the sea in ships," or subject their property to the dangers of the deep and the anger of the winds. It requires the strongest proof to overcome the almost conclusive inference that the loss comes of the storm, and not of any negligence of those unfortunates whose business it is to battle with it, and come out safely if they can. The fallacy of the libelants' contention is that the captain of the Wilhelm knew, or should have known, that this storm would occur. That some stormy weather was indicated is possible, on this proof, but *non constat* that the indications were such as would portend the extraordinary fury of the

storm that did come; and *non constat* but that the vessel would have safely arrived in the port of immediate destination if the fury of the winds had been less, and the storm only one of those ordinary occurrences which all vessels should be prepared to meet, and which would never detain a brave seaman from pursuing his voyage in the interest of commerce; and particularly of that rapid transit, without unnecessary delay, which is required to meet the competition of the more rapid transit by rail on land in these days when the quick transportation of merchandise is an element of successful trade.

Here was a voyage projected in the very last days of the season of navigation, when insurance policies were expiring, and whatever was to be done in the way of navigation in the lakes must be done quickly. It was a season of danger for such enterprises, undoubtedly, but those dangers were as well known to the libelants, who committed their vessel to this voyage, as to the respondent, who undertook to do the towing for them; and it was just as well known to each that at that season any delay endangered such an enterprise by a close of navigation quite as much as would the perils that come of proceeding with it. It was no time for delay in the voyage, if it were possible to avoid it. Under such circumstances, a master would be less blamable to go on than to lie by, except for the most imperative necessity. In my judgment, it would have been cowardly navigation, under these circumstances, to have gone into Thunder bay at 4 o'clock A. M. in the morning of November 27, 1889, with this tow, because of the indications of bad weather at that time and place. Proverbially, indications of the weather are unreliable. From the ancient ground hog to the modern superintendent of the weather bureau at Washington, the weather-wise are as often false as true prophets, and their miscalculations are the daily subject of good-humored derision by the public. Useful as are the monitory storm-flags sometimes, not infrequently they are hauled down amidst the laughter of the people, from cloudless skies and radiant with the sunshine. But there was no cautionary storm-flag on the government station nearest to Thunder bay at Alpena on that morning, and the officials whose business it was to look out for it had not detected this storm at or prior to the time when Capt. Bennett was passing Thunder Bay light-house any more than he had detected it. And a fact like this is worth more as evidence than the *ex post facto* opinions of witnesses, who now think they saw in the then indications a portend of this notable storm. It is human nature to believe that one has foreseen such an event, and I doubt not the witnesses unconsciously speak more of their present than their then existing impressions of that which was indicated. The conflict of testimony and opinion of just what was expected shows that the indications were not very certain of what would happen. But, as before remarked, it is not enough to prove that stormy weather was indicated,—and this is the most that can be said of the proof in favor of the libelants,—but the proof should go further, and show that there were reasonable indications of a great and furious storm, from which it was prudent to seek a harbor of refuge. I do not think this was indicated at 4 o'clock that morning.

The absence of any indications or warnings by the weather bureau until much later in the day, and the testimony of the light-house keeper and the surfman of the life-saving station at Thunder Bay light-house, who were the witnesses nearest to this tow at that hour, and whose especial and official business it was, to note the condition of the weather, shows this fact to be true, I think.    Nor is it contradicted by the testimony of the seamen in charge of other tows going up and coming down, which also suffered by the storm.    These speak of the weather indications in terms more favorable to the libelants' view, but, making allowance for great distances of time and place in their observations, respectively, and for the natural impressions of the actual occurrence of the storm itself, before adverted to, as affecting such testimony, and it is not in serious conflict with the official witnesses.    The testimony of the people in charge of this tow, as to the facts which existed at that time, confirm the impressions made on the official witnesses as to the then state of the weather, and its indications of future trouble.    The vessels were making what the sailors call "good weather," that is to say, were sailing in their course without difficulty, and everything going on rightly.    The last schooner in the tow had had a few boards washed off her deck load, and her mate had broken his leg during the night.    Her captain set a signal of distress, hoping to have the steamer towing him put into Thunder bay, so as to send the injured mate to the hospital, and he now thinks he should have taken shelter from the approaching storm; but his manner of testifying, and his whole demeanor, show that this is rather an after-thought, and his real trouble was the injury to the mate.    But it is beyond dispute that the people in the Wilhelm knew nothing of this occurrence or of the signal of distress, and if they had, it would have been a fair judgment of the master to keep on his voyage, and not stop for a broken leg, just then.    It could not have been negligence, or, if it were, it had nothing to do with this disaster.

We can see now that, if the Wilhelm and her tow had put into Thunder bay because of the threatening clouds, the stiff wind, the heavy seas, the broken leg, and the distress signal, this wreck would not have occurred, perhaps, if he had had good luck in getting in, or had met with no misfortune in coming out again, and pursuing his voyage amid other storms and other accidents; but this is no proper test of prudence in the conduct of affairs anywhere.    It might as well be said that, if he had never left the port of departure, there would have been no loss.    When three or four hours later than that at which he passed Thunder bay the storm began, and the situation became serious, indeed, it might have been well enough to put back into Thunder bay, and, again, if good fortune had attended the maneuver, and its dangers had been successfully encountered, there would have been no loss. But this is an assumption of good fortune which might have miscarried. He had started for Tawas, a safe port, which he might reach in a few hours' run.    It was his business and his interest to make progress in that direction.    Advance is always to be preferred to retreat, in such cases of doubt, or at least human judgment tends in that direction, with

stout hearts. The wind was in his favor going to Tawas, and he would be sailing before the storm, or along with it. If he put back, he would be contending with adverse winds and waves, and the storm would be just as furious. It might have been evenly balanced, but, surely, a competent master should be left to decide such a question as then and there presented itself to him, without having an imputation of negligence cast upon him, if it should turn out that his decision was not the best, as measured by those of us now here passing upon his conduct, with no storm to disturb our calculations, and in the light of that which has happened, but had not occurred when he made up his mind. This is what a master is constituted to do,—precisely. It is just the reason why his power is almost absolute in the law of the sea. The decision belongs to him, and not to us, and the law protects him in that right by refusing to challenge it, unless under circumstances that demonstrate his incompetency and negligence, not merely some error of judgment on his part. Again, I say, the mere happening of the disaster does not condemn his judgment; for some other disaster might have befallen him if he had taken the other course, and been a surer condemnation of him. It is a gratuitous assumption to assert that it would have been safer to put back than to go on. But, concede this, and we have only an error of discretion which the courts will not challenge, and for which an owner cannot be liable. This is clearly the decided law of the cases, if we are correct in the finding of facts above made, that he was not improperly in that place at that time, and need not have been, for prudence sake, safely anchored in Thunder bay, in refuge from a storm, the extraordinary fury of which he could not have reasonably anticipated. Owners of vessels must employ masters of reasonable skill, but they do not contract that they shall possess extraordinary judgment, nor that they shall not do in any given emergency what, after the event, others may state would have been bad. *The Star of Hope*, 9 Wall. 203, 230; *Lawrence* v. *Minturn*, 17 How. 100; *The W. E. Gladwish*, 17 Blatchf. 77, 83; *The Mohawk*, 7 Ben. 139; *The Clematis*, 1 Brown, Adm. 499; *The Donaldson*, 19 Fed. Rep. 264.

The same argument applies exactly to the choice of route which the Wilhelm took on this occasion. If she had gone more out into the open lake, and further from the lee shore upon which the libelants' vessel was driven after parting from the Wilhelm, possibly she would have ridden out the storm, and no disaster would have taken place. She took the usual course, used her lead freely and intelligently, kept out into sufficient water, as far as possible in such a storm, and the nearness of her course to the shore was not the cause of the wreck. The tow-line parted, and it was this that caused the vessel to be wrecked. If the wrecked schooner had been further out in the lake, she would have had a greater distance to be driven to reach the shore; she might have found means to extricate herself, or have escaped altogether, and then she might not. None can tell. But, after all, the nearness of the shore was only an incident of this loss, in the sense that the vessel was not driven ashore because the course was too close for safety of navigation, but because the tow-line parted; not from any cause with which this nearness to the

shore was connected, nearly or remotely, but from a cause equally efficient, near in or far out, and the vessel adrift had not the means to take care of herself. I do not mean to attach blame for this, but only to state the fact. It does not at all appear that she could have taken better care of herself further out, or that she would have been more safely adrift, except that she might have been longer in reaching this or some other shore, if she did not founder in the deep. But this is all speculation after the event, as before, and not available in fixing a fault on the Wilhelm. The case of *The Donaldson, supra,* seems in point here, and the decision of the master must be taken as conclusive. In the case of *The Argus,* 31 Fed. Rep. 481, the master put out to sea to keep off a lee shore, and lost his tow nevertheless, and yet he was not held liable, on the principle we are considering. And in the case of *The Allie and Evie,* 24 Fed. Rep. 745, it appearing that the tug was capable of handling such barges as she had in tow in any weather ordinarily to be expected on such a trip, she was not liable for not dropping them astern, when it appeared they were not equipped to live in such a sea alone, and adrift from the tug. These cases and many others also show that weather indications which are unreliable do not of themselves, even where storm-flags are flying, for example, or there is a threatening barometer, show a case of negligence. It depends on all the circumstances of each case, and the necessity for getting along, although taking risks, is a large factor in the problem; and the judgment of the master is conclusive, unless it appears that he has violated the common rule of prudence under similar circumstances. Any other rule of decision would impose upon the vessel furnishing the towing power the liability of an insurer or guarantor of safe navigation, for there could scarcely be a case where the closest scrutiny might not develop some departure from the standard of the highest skill. Few reach that degree of excellence in any calling which furnishes in each or any performance an entirely perfect piece of handiwork. I am sure lawyers and judges do not reach it, and I do not see why it should be expected of master mariners.

Coming, now, to the more specific faults imputed to the Wilhelm, that of not laying her head to the wind until the storm abated, at the time she first hauled away; that of taking a shoal-water course the second time after the previous warning of the necessity of keeping out; that of not clearing Fish point before hauling out the second time; and that of hauling out too abruptly at the time of this second maneuver, whereby the tow-line was parted,—it may be said that what has already been argued in this opinion in favor of the conclusiveness of the master's decisions, in all emergencies where there is any doubt about the propriety of his maneuver, or, rather, when it does not clearly appear that common and usual prudence has been violated by it, applies with equal force to these minor allegations of fault as to the more general imputation of negligence already considered. But it is proper to say, further, that, in the judgment of the court, the criticisms are unfounded. It must never be forgotten in this case that this tow was bound to Tawas as the immediate port of destination, to pick up another vessel there, and that after

passing Thunder bay it was likewise the nearest harbor of refuge from the storm. The purpose of going there, and the necessity of going there, were alike controlling with the master. It was less than a day's run to get there, and progress in that direction was reasonably to him, under the circumstances, the course of safety as well as necessity; and the lying to all night in the storm, instead of going on, was at least doubtful, and the master's decision should be conclusive. At the time she first hauled out, the purpose was not to lie to the wind, hove to, until the storm abated, but only until she could adjust her cargo and recover her trim. Having done this, she resumed her course. If she had not, it might have been better; but of that we cannot be certain. We can only feel quite sure that disaster would not have come in the shape it did. So it would not if she had done almost anything else than that which she did do; but that is not the test, as before adjudged. Going ahead with the storm, and on her intended voyage, was not unreasonable, as things then were, although something else, or that which is suggested, may now appear better to us. The event is always a great teacher, says Mr. Justice BRADLEY. *The Nevada*, 106 U. S. 154, 157, 1 Sup. Ct. Rep. 234. Her own arrival at Tawas, and her ability to hunt up her separated tows after the storm abated, proves her sea-worthiness, and is a fact, better than any opinions, demonstrating that, if the tow-line had not parted subsequently, this holding up to the wind was not an absolutely necessary maneuver. Perhaps the force that parted the tow-line might not have been called into action if she had remained hove to longer than was required to trim her cargo; but, again, it might have been, and we cannot tell. Like the rest, it is speculating for ourselves upon a contingency that might have come around in spite of our speculation, and the right to pass judgment on chances at that time was his, not ours. As to taking shoal water a second time after warning, the objection is misleading, or else a misapprehension. He did not heave to because of shoal water. He used his lead intelligently, and got into the water of the usual course as often as he found himself driven by the force of the storm nearer the shore. It only amounts to the general imputation, before disposed of, that he did not allow more leeway, and go further into the lake.

The second hauling out and heaving to was for an entirely different purpose than the first, but the same general purport of this decision applies to it as to the other conduct criticised by the imputations of fault, and there are other considerations connected with it which apply especially to it. He hauled out to get away from his drifting with the storm towards the lee shore, under the warning of his lead, and hove to to take his bearings when the snow-storm broke, to avoid the danger of passing the point of safety for him, in view of the fact that he was going to Tawas, and was compelled to go there. Going too far, he would get beyond Tawas, so to speak; that is, get to a point where he was in more danger, and could not so readily turn into Tawas. He wanted to see the land, and know that he was not doing that thing which he feared. Again, it was a temporary purpose for which he hove to, and it cannot

be said that he made that maneuver to ride out the storm, and made it in a wrong place for that purpose. He made it in the right place, for the purpose he had in view, namely, holding back so as not to go beyond the safe point for making Tawas. And can it be said he should have passed Tawas, or, which is the same thing, passed the place he deemed safe for making Tawas, in order that these vessels may have escaped Fish point, if their tow-lines should part? And this is all that the objection that he did not clear Fish point amounts to in the end of the analysis. If the tow-line had to part, and the vessels were to be driven ashore by the wind and waves, it might as well be at Fish point as below it, when he should haul out below, and part the line there, by the maneuver that he made off Fish point. There was nothing in the Fish point situation contributing to the parting of the tow-line. It is true the vessels would not have been stranded on Fish point, but there is nothing in the relation of the place off Fish point, where the maneuver was made, to the breakage of the line itself, which is the important point of inquiry or observation. There was no rock there or other obstruction to even aid, much less produce, the parting of the line, and the place at which it parted is wholly immaterial, it seems to me. This imputation of fault well illustrates that hypercriticism of navigation, which goes on in the court in cases like this, so sharply inveighed against in *The Free State*, 1 Brown, Adm. 251, 269.

Lastly, we come to the parting of the tow-line. It is said this was caused by too abruptly turning about in making the maneuver of hauling to, head to the wind, off Fish point. It seems to the court quite idle to seek for any other cause for the parting of this tow-line than the resistless force of the storm itself, described in the proof to have been the most violent and destructive that ever swept Lake Huron. Why should we go, as has been done in the trial and argument of this case, below the decks of this propeller, laboring in a mighty storm, from which her cargo was being swept by the angry waters, and examine her flooded engine-room, her diminished steam, and somewhat shackled engine, listen for the sound of her signal above the howling of the furious winds, watch the haste and the trembling movements of her death-threatened officers and crew, to inquire whether this turning to the wind, almost *in extremis*, for safety from the driving storm, was more or less abrupt in its relation to a tow-line chafing in its chock, although sufficiently parceled, they say, or whether everything here was done precisely as it ought to have been done in the face of such an extraordinary storm, when we find in its violence a tremendous and unusual force, abundantly capable of causing this disaster? The court finds the parting of the line to have been caused by the fury of the storm, and that it was an act of God, against which the owners of the Wilhelm did not insure the vessel of the libelants. Dismiss the libel, with the costs.