## THE E. LUCKENBACK.

(District Court, S. D. New York. June 1, 1901.)

1. TOWAGE—INJURY OF TOW—LIABILITY OF TUG.

The owner of a tug is not an insurer against marine perils, and is liable only for the want of reasonable diligence and skill in the towing service; nor is an error of judgment on the part of the master equivalent to negligence.

2. SAME.

A tug having in tow five mud scows, proceeding down the Elizabeth river to the dumping grounds in Chesapeake Bay, laid up during the night, owing to a high wind. In the morning the weather was clearing, the wind had abated, and the tug proceeded out into the bay. When near the dumping grounds the wind suddenly increased, the lines parted, and some of the scows were injured. The weight of the evidence showed that there was no good reason to anticipate danger until it was too late to safely return. *Held*, that the tug was not liable for the damage to the scows.[1]

In Admiralty. Libel against tug to recover for injury to tows.

Carpenter & Park, for libelant.
J. J. Macklin and R. H. Bickford, for defendants.

BROWN, District Judge. In the forenoon of October 31, 1899, five scows in tow of the tug Luckenback in Chesapeake Bay, near the ripraps off Old Point Comfort, got adrift in a gale and sustained damages or incurred charges for which the above three libels were filed. The tug and tow had come down Elizabeth river the night previous intending to proceed out into the bay to dump the scows; but meeting a high wind they laid up for the night at Lambert's Point below Norfolk. The following morning between 7 and 8 o'clock, the wind being much abated and the sun out occasionally, the tug resumed her way. On coming into the open bay at Sewell's Point, there was more wind, and when near the ripraps, the wind increased suddenly, the tug's bridle soon broke, and afterwards the lines connecting the tandem scows.

The libel charges the tug with fault, first, in leaving Lambert's Point in the existing conditions of the weather; and, second, in not turning back after leaving Sewell's Point on account of the high wind. The answers deny any negligence and aver that the weather was suitable on leaving Lambert's Point and Sewell's Point but increased suddenly at the ripraps; and that the damage arose from the parting of the lines between the scows supplied by the libelants, and also that the tug was chartered to the libelant and was navigated under his control and direction.

The evidence shows that the libelant was the charterer of the tug for the purpose of towing the mud scows; but the navigation of the tug on the particular trips to which she was assigned, was I think under the direction and control of the master of the tug as the representative of the owner at that time, and that the tug is therefore

---

[1] As to perils by wind and waves, see note to The Dunbritton, 19 C. C. A. 467.

responsible for any negligence or fault of the master in such navigation.

The owner of the tug, however, is not an insurer against marine perils, and is liable only for the want of reasonable diligence and skill in the towing service. The Margaret, 94 U. S. 494, 496, 24 L. Ed. 146; The Allie and Evie (D. C.) 24 Fed. 745.

I think considerable of the testimony on the part of the libelant as respects the conditions of the weather on leaving Lambert's Point and Sewell's Point, is the result of the wisdom that comes after the event. Mr. Buckner, the government inspector, who was on board the tug to superintend the dumping, and a man of long sea experience and a wholly disinterested witness who was called by the libelant, clearly repels any charge of negligence or fault in leaving both places. He says:

"Q. What was the weather when you started? A. The weather was good enough when we started.

"Q. Did you see any impropriety about starting? A. Not then.

"Q. How fast was the wind blowing when you started? A. I suppose about 10 miles an hour.

"Q. Did you suppose there would be any trouble until these lines parted between the scows? A. I didn't think there would be any trouble until we got nearly down to ripraps.

"Q. You thought it was all right up to that time? A. Yes, sir.

"Q. What time of day was that? A. About 10 o'clock.

"Q. Had there been a great decrease in the wind from the night before? A. Yes sir.

"Q. And everything looked safe enough? A. If it had not been we would not have started.

"Q. The wind was north? A. Yes sir.

"Q. Until you had passed the black buoy (halfway from Sewell's Point to ripraps) you did not anticipate any trouble at all? A. No sir.

"Q. Was there a great sudden increase in the wind then? A. Yes sir.

"Q. And the sea commenced to get rough? A. Ebb tide, yes sir.

"Q. How far were you from the dumping grounds when you first felt that there was likely to be trouble? A. Well, about a mile and a half from the ripraps then.

"Q. Near to the dumping grounds? A. About a mile and a half.

"Q. If the lines had held together don't you think you would have been all right? A. Yes sir.

"Q. How far from the black buoy had you anticipated trouble for the first time? A. Nearly down to the ripraps.

"Q. How far from the ripraps? A. A couple of miles.

"Q. How fast were you moving before that? A. I don't know, not over three miles an hour.

"Q. Don't you remember the sun shining that day? A. The sun was shining some.

"Q. Was there every indication of clearing weather when you started? A. Looked something like it, but the wind was increasing."

The inspector, who was accustomed to those waters, at no time before the accident suggested any return with the scows. That might have been done when in the vicinity of the black buoy, but not when near the ripraps; and the inspector anticipated no trouble until near the latter, and thinks that no harm would have ensued had not the lines parted, and the testimony shows that the lines were good. This is further confirmed by the fact that during some five or six hours after the accident the Luckenback and another tug, the Hudson, were maneuvering in picking up the scows, in dumping

them and in taking them all back, except one which stranded. All the witnesses, moreover, testify to the sudden great increase of the wind when in the vicinity of the ripraps. I see no reason for charging the master with foreseeing such an event, or that the lines would part.

The alleged fault in not returning before reaching the ripraps is of much the same character. The superintendent of the line had been urging expedition upon the master. This would not be a reason for excusing him for incurring any unreasonable risks; but it is evident from the inspector's testimony that no trouble was anticipated by any one and no idea entertained of returning, until the accident had actually happened through the breaking of the lines in the sudden increase of wind near the ripraps, and after a return was impracticable with such a tow, through the narrowness of the channel. Even if the master made an error of judgment in not returning sooner, this is not the same thing as negligence, and negligence does not seem to me to be established by the testimony. The Allie and Evie, supra.

Without considering therefore the further defense that the plaintiff's agent was cognizant of the sale of the tug shortly after the accident and that he permitted the sale to proceed to a purchaser for value without asserting or making known any claim of lien upon the tug by reason of this accident, I think the libel should be dismissed upon the grounds first above stated, with costs.