## THE CZARINA.

### (District Court, N. D. California. November 1, 1901.)

#### No. 11,965.

1. TOWAGE—LOSS OF TOW—LIABILITY OF TUG.

   The obligation of a tug is to use ordinary care and diligence with respect to all matters connected with the service she has engaged to perform, and a mere error of judgment on the part of the master will not render her liable for the loss of the tow, unless the error was so gross that it would not have been made by a master of ordinary prudence and judgment.

2. SAME—LOSS OF RAFT—TEMPORARY ABANDONMENT.

   A steamship engaged to tow a large raft of timber from Puget Sound to San Francisco, and when within two days' sail of the latter port the hawser parted, and the tow went adrift. A strong wind was blowing, and the sea was so rough as to make it unsafe, in the judgment

of the master, to attempt to recover it at the time, or to remain near it during the night; and he was also of the opinion that he could not keep it in sight if he remained, and would lose his bearings. Under such circumstances, he proceeded to a port, where he communicated with his owners, and on the next morning and for two days following he searched for the raft, but, owing to fog, was unable to find it. It was recovered three weeks later by another vessel, 450 miles southwest of San Francisco, and brought in, but in a damaged condition. *Held,* that as it did not appear that the master erred in his judgment, or that he could have kept the raft in sight and recovered it if he had remained in the vicinity, his action in leaving it was not such negligence as rendered the steamer liable for the damages sustained by its owners.

In Admiralty. Action against the steamer Czarina for damages for breach of a towage contract.

Page, McCutchen, Harding & Knight, for libelant.

Andros & Frank, for claimant.

DE HAVEN, District Judge. This action was brought against the steamer Czarina to recover damages for alleged breach of a contract for the towage of a raft of piles and spars from Puget Sound to the port of San Francisco. The contract, so far as relates to the question involved in this case, is contained in the following offer made by the owners of the Czarina and accepted by the libelant on July 12, 1899:

" * * * We herewith offer to tow the raft now at Puget Sound to San Francisco * * * for the sum of twenty-seven hundred and fifty dollars (\$2,750); and we to deliver raft at Arctic Oil Works Wharf, or as close thereto as it is possible to get it. Your company to furnish the hawser. This price is on the basis of 'no cure, no pay.' Steamship Czarina to be employed for this purpose. We will also furnish free passage for three men by said steamer, and the towing hawser is to be coiled on top of raft upon arrival at destination. * * *"

The Czarina left Seattle for San Francisco August 26, 1899, with the raft in tow, and so proceeded on her voyage until 6 o'clock on the morning of September 7th following, when at a point a little north of Point Arena, and about 20 miles off the coast, the hawser by which it was towed parted, and the raft went adrift upon the ocean. The raft was recovered by the steamer San Pedro about three weeks later, 450 miles south of where it went adrift. When recovered it was in a damaged condition, many of its timbers having been lost. The raft was of the value of \$80,000, when it left Seattle, and it is alleged in the libel that the timber lost from it while it was adrift was of the value of \$8,400. The libelant seeks in this action to recover as damages the value of the timber lost, and also the expense incurred by it in having other tugs search for the raft, and the amount paid for towing it to San Francisco from the place where it was found.

1. It will be observed that under the contract set out in the foregoing letter the right of the Czarina to receive the stipulated sum named therein for towage was contingent upon the successful towing of the raft from Puget Sound to San Francisco. This fact, however, did not affect her obligation to exercise reasonable skill and care in the performance of the contract of towage. As before stated, the hawser by which the Czarina was towing the

raft parted, and the raft went adrift. The hawser parted at the point where it was spliced around a large iron thimble connected with a staple and chain made fast to the Czarina. It is not directly charged in the libel that the hawser was cut by any person connected with the Czarina, but upon the trial it was contended that such was the fact, and at least one witness gave it as his opinion that it was cut by some person, basing that opinion upon the appearance of the hawser at the point where it gave way; and that portion of the hawser was also introduced in evidence for the purpose of showing that it had been intentionally cut by some one. The court would not be warranted in so finding, except upon clear and satisfactory proof of the fact; and, upon consideration of the evidence, I am not satisfied that the hawser was cut by any person. The condition or appearance of the hawser, which it is claimed shows that the splice was cut by some one, is not of itself sufficient proof of the fact; and there is no other evidence tending to prove it, except the opinion of the witness before referred to. It is not shown that any person connected with the Czarina had any motive for casting the raft adrift. On the contrary, it was to the interest of the Czarina to successfully tow it into San Francisco. She had already been engaged in towing the raft for 12 days, and in 2 days more would have been able to reach San Francisco with it. There was not at the time any actual or apprehended danger from continuing on the voyage with the raft in tow, and it is difficult to believe that any one connected with the Czarina deliberately cut the hawser, endangering the safety of this valuable raft, and at the same time preventing that steamer from full performance of the contract of towage, which was then so nearly completed. In view of these considerations, which are certainly entitled to great weight, I am inclined to agree with the witnesses who testified that in their opinion the parting of the hawser was caused by chafing against the edge of the thimble. I cannot say that such was not the case from an inspection of the hawser alone, as it does not seem to me impossible for it to have received in this way the injury it appears to have sustained.

2. This conclusion reached, it remains to consider the allegation that the Czarina negligently abandoned the raft when the hawser parted, and did not use reasonable efforts to recover it. The Czarina did not stay by the raft, but immediately after the accident steamed for the coast, and arrived at Point Arena at 11 o'clock in the forenoon of the same day. She did not leave there to search for the raft until the next morning, when she proceeded 40 or 50 miles to sea, returning to Point Arena late in the afternoon, and then steamed up and down the coast for two hours near shore. The next day she again went to look for the raft, and also on the following day. The weather during all of this time was foggy, and the sea was not smooth, except near shore. The evidence leaves no doubt in my mind that it would have been dangerous to attempt, and perhaps impossible, to pick up the raft at the time it went adrift. I am also satisfied that after the Czarina reached Point Arena, on the day of the accident, her master used reasonable efforts to find and recover the raft. The decision of the case must therefore necessarily turn upon the ques-

tion whether there was any breach of the contract of towage, in not standing by the raft during the day, and until the darkness of night rendered it unsafe to longer remain in its vicinity; or, stated in another form, was the master of the Czarina guilty of negligence in leaving the raft at the time he did, or ought he to have remained with it so long as he could have done so with safety to his vessel? The reason given by the master of the Czarina for not staying by the raft is, in substance, this: That the sea was so rough that the raft could not be picked up at the time it went adrift; that, in his judgment, there was no probability that the wind would go down or the sea become smooth enough to enable him to recover the raft during the day, and that it would have been dangerous to attempt to stay by it during the night, because he would not have been able to keep it in sight; that in the morning he would not know where it was, or be able to ascertain his own position, and by going to Point Arena, as he did, he could make certain of his position, "and could always run back to the spot where he lost the raft, and make a line, according to his judgment, of where the raft had drifted"; that, under the circumstances, he thought it best to go to Point Arena and communicate with his owners, in San Francisco. He also testified that there would have been no difficulty in finding the raft if it had not been for the fog which prevailed on the following and succeeding days, and that when he left it he fully expected he would be able to find it upon returning from Point Arena. It must be remembered that the Czarina is not to be held to the responsibility of an insurer that the enterprise of towing the raft would be successful, and carried through without loss. Her obligation was to use ordinary care and diligence to bring the raft in safety to San Francisco, and this obligation imposed upon her the duty to make proper efforts to recover it when the hawser parted, and for this purpose to stay by it so long as there was any reasonable probability that by so doing it could be saved. But the Czarina cannot be held liable for the subsequent loss of a portion of the raft, before it was finally recovered, "because the master in an emergency did not do precisely what, after the event, others may think would have been best." The Hercules, 19 C. C. A. 496, 73 Fed. 255. This principle of law was very clearly expressed by Chief Justice Waite in the case of The W. E. Gladwish, 17 Blatchf. 77–83, Fed. Cas. No. 17,355:

"The tug undertook to bring to this work such prudence and such nautical skill as was ordinarily required in such navigation. More was not contracted for, and more was not expected. When the ice was reached it became necessary to decide whether to lie by or to go on. This involved the exercise of judgment as to what ought to be done under the circumstances. A mere mistake is not enough to charge the tugs with any loss which followed. To make them liable, the error must be one which a careful and prudent navigator, surrounded by like circumstances, would not have made."

The following cases are also to the effect that a mere error of judgment upon the part of the master of a tug will not render it liable for the loss of the tow, unless the error was so gross that it would not have been made by a master of ordinary prudence and judgment. The Battler, 19 C. C. A. 6, 72 Fed. 537; Sonsmith v. The J. P. Donaldson (C. C.) 21 Fed. 671; The James P. Donaldson (D. C.) 19 Fed.

264; The Packer (C. C.) 28 Fed. 156; The Wilhelm (D. C.) 47 Fed. 89; The Mohawk, 7 Ben. 139, Fed. Cas. No. 9,693; The Frederick E. Ives (D. C.) 25 Fed. 447; The Mosher, 4 Biss. 274, Fed. Cas. No. 9,874. Undoubtedly, when the hawser parted it devolved upon the master of the Czarina to exercise his judgment as to what ought to be done,—whether to stand by the raft so long as he could do so with safety to his vessel, or to proceed immediately for the shore. The condition which confronted him was this: A valuable raft was adrift, a strong northwest wind blowing, and the condition of the sea such that, in his opinion, the raft could not be recovered during the day. He did not think it safe to remain near it during the night, or that, if he should attempt to do so, he would be able to keep it in sight. Under these circumstances, it was his judgment that he could render no service to the raft by remaining with it during the day, and that the best course to pursue was to immediately communicate with his owners, in San Francisco. In acting upon this determination, I do not think it can be said that he committed an error,—much less, a gross error of judgment,—and there is nothing in the evidence which tends to show that, if a different course had been pursued, the raft could have been kept in sight during the night, or that it would probably have been recovered sooner than it was. In the presence of weather and sea conditions such as then prevailed, a master of ordinary skill could certainly form a reasonable judgment upon the question whether it was probable that the wind would so moderate during the day as to make it possible to pick up the raft before night; and it certainly has not been shown that the master of the Czarina was mistaken in the judgment which he formed in relation to that matter. Upon the question whether a prudent master, surrounded by the same circumstances, would have pursued the same course, the evidence of experienced navigators would have been competent. The Frederick E. Ives (D. C.) 25 Fed. 447. No witness of that character testified that the master of the Czarina, in leaving the raft, did what a prudent and careful navigator would not have done under like conditions. The testimony of the first and second officers of the Czarina is to the effect that it would have been dangerous for the steamer to have attempted to stay by the raft during a dark and hazy night, with the wind as strong and the sea as rough as it was when the raft went adrift; and that it would have been so seems evident to me. The Czarina was not a tugboat, but a large steamer, and could not be handled in a rough sea as easily and quickly as a small steamer. The raft, although a large body, only floated 12 feet above the water; it had no lights upon it; and, conceding that it would have been possible for the Czarina to have kept so near to it during the night as to have held it constantly in view, to have done so would certainly have been attended with great danger. Unless, therefore, there was a reasonable probability that the wind and sea would go down, so that the raft could be picked up during the day, the Czarina was not required to stand by until night, since by so doing she could have rendered no service to it.

It follows that the libelant is not entitled to recover. The libel will be dismissed, with costs.