## THE COVINGTON.

(District Court, S. D. New York. March 22, 1904.)

1. TOWAGE—LOSS OF BARGE IN HEAVY WEATHER—EXERCISE OF JUDGMENT BY MASTER.

   When the master of a tug exercises his judgment, in good faith, to proceed with his tow, it will not be deemed a fault chargeable to the tug if it turns out badly, especially where it appears doubtful if a barge which is lost in bad weather was in proper condition for towing.

2. SAME—LIABILITY OF TUG—EVIDENCE CONSIDERED.

   An ocean tug held not in fault for the loss of a barge in tow by sinking off the coast of New Jersey in heavy weather, where, as shown by the government weather records at different stations along the Atlantic Coast, the weather was favorable when the tug left Hampton Roads for New York with three coal barges in tow, and did not become such as to endanger seaworthy barges until about the time of the accident, two days later, when it was too late to turn back to seek a harbor, and the best course seemed to be to proceed, which the master did; and where it further appeared from the evidence that the barge, which was a converted ship, was not as well adapted to withstand a storm as modern barges.

In Admiralty. Suit against tug to recover for the loss of a tow.

James J. Macklin, for libellant.
Butler, Notman, Joline & Mynderse and Frederick M. Brown, for claimant.

¶ 1. See Towage, vol. 45, Cent. Dig. § 13.

ADAMS, District Judge. This action was brought by Charles Mc-Williams, owner of the barge Mindoro, against the tug Covington, to recover the value of the barge, which was sunk at sea by reason of weather conditions, about 8 miles off Barnegat, New Jersey, on the 8th day of April, 1902, while in tow of the tug, bound from Hampton Roads, Virginia, to Providence, Rhode Island, by way of New York.

The two consisted of three barges, loaded with coal, made up tandem, the first barge being the Kentucky, belonging to the claimant, 225 fathoms from the tug; the next, the Mindoro, the subject of this action, 200 fathoms from the Kentucky, and the last, the Mystic Bell, 200 fathoms from the Mindoro, abandoned in the storm.

The controversy arises with respect to the state of the weather when the tow started from Hampton Roads, on Sunday the 6th day of April, about 9:30 o'clock A. M. and when it passed the Delaware Breakwater between 1 and 2 o'clock P. M., Monday the 7th.

The libel alleges fault on the part of the tug as follows:

"(1) In starting out with said tow from Hampton Roads while the weather indications were unfavorable.

(2) In continuing on and not returning and making a harbor, or otherwise protecting her said tow, when it was or should have been manifest to those in charge of said tug of the near approach of a violent storm.

(3) In not putting into the Delaware Breakwater which she could have done in perfect safety when in that vicinity for harbor.

(4) In that those in charge of said steam tug were incompetent."

The answer alleges that when the start was made, about 9:30 o'clock A. M., the 6th, the sea was calm, a slight wind from the south and east prevailed and the weather was in all respects favorable; that when the tow passed abreast of the entrance to the Delaware Breakwater, light winds and favorable weather prevailed but that shortly before daylight on the 8th of April, when the tow was nearing a point opposite Barnegat, the wind freshened, coming from the north-east, and the indications of weather became somewhat threatening, although not sufficiently so to justify an ordinarily prudent navigator in seeking a port of refuge, which then was New York; that it would have been imprudent, in any event, to turn back and make for the Breakwater, as the barges were ill adapted to withstand high seas from the stern, from which quarter the seas would have come in a course to the Breakwater; that, therefore, the voyage was continued without indications of serious danger until 7 o'clock A. M., although for the previous hour, the tug and tow had been laboring heavily in a high sea and strong east north-east gale, when the bow of the Mindoro was observed to rise out of the sea and immediately thereafter she sank stern foremost; that the tug, therefore, anchored the Kentucky, dropped the towing hawser and proceeded to the assistance of the other barges, but when she reached where the Mindoro had been, nothing remained but wreckage; that the tug then rescued the crew and stood by to give any possible assistance to the Mystic Bell but that it was found impossible to take her in tow and after her crew were rescued, she became a total loss.

The answer further alleges that the loss of the Mindoro happened, notwithstanding all due care and prudence on the part of the Covington and those in charge of her, and notwithstanding all possible efforts to

avert the same and was the result of inevitable accident, caused by perils of the seas, or was due to the inherent weakness, rottenness and unseaworthiness of the Mindoro in not being able to withstand the storm to which she was subjected on the morning of the 8th of April.

The preponderance of the testimony tends strongly to support the averments of the answer. It appears that the Mindoro was a converted ship and though apparently in good seaworthy condition, was not as well able to withstand a storm as a modern barge, such as the Kentucky was. At the time° of starting, the weather was not such as to make it negligent to proceed, nor was it so when passing the entrance to the Breakwater, though one of the tows that started with the Covington went in there and remained until the storm was over, but the seeking of the shelter was testified to be due to the condition of one of the barges, which had rolled so that her masts went over her side and she was hampered by the wreckage. This was apparently owing to the qualities of the barge, rather than bad weather, but in any event, the question of going on was one of judgment and it is too well settled to admit of much discussion, that when the master of a tug exercises his judgment in good faith to proceed, it will not be deemed a fault chargeable to the vessel if it turns out badly—The W. E. Gladwish, 29 Fed. Cas. 585; The James P. Donaldson (D. C.) 19 Fed. 264; The Allie & Evie (D. C.) 24 Fed. 745; The Frederick E. Ives (D. C.) 25 Fed. 447; The Packer (C. C.) 28 Fed. 156; The Wilhelm (D. C.) 47 Fed. 89; Id. (C. C.) 52 Fed. 602; The Battler (D. C.) 62 Fed. 602; The Hercules, 73 Fed. 255, 19 C. C. A. 496; The E. Luckenback (D. C.) 109 Fed. 487; Id., 113 Fed. 1017, 51 C. C. A. 589; The Czarina (D. C.) 112 Fed. 541.

Moreover, the Government Weather Records, which are always considered in cases of this kind, have been furnished from Norfolk, Virginia, Cape May and Atlantic City, New Jersey, and New York City. They offer persuasive evidence that the weather was favorable for proceeding, both at starting and when passing the entrance to the Breakwater.

Those from Norfolk show that on the 6th, the wind was from the south, with a velocity of 8 miles in the early morning, and 6 miles at midnight, the highest being 30 miles from the north-west for a few minutes about 6:25 P. M. On the 7th, the wind changed from the south-west in the morning to east at midnight, with a velocity of 5 miles in the early morning and 15 miles at midnight, the highest being 18 miles from the south-east for a few minutes about 1:13 P. M. On the 8th, the wind changed from 8 miles from the south in the early morning to 11 miles from the south-west at midnight, the highest being 36 miles from the south-west for a few minutes about 3:40 P. M. On the 9th, the wind changed from 10 miles from south-west in the early morning to 10 miles from the west at midnight, the highest being 26 miles from the north-west for a few minutes at 10:02 A. M.

· At Cape May, on the 6th, the wind changed from 3 miles in the early morning to 7 miles at midnight, the highest velocity being 26 miles from the south for a few minutes about 5:35 P. M. On the 7th, the wind changed from 8 miles in the early morning to 16 miles at midnight, the highest velocity being 20 miles per hour for a few minutes about

11:56 P. M. On the 8th, the wind changed from 18 miles in the early morning to 4 miles at midnight, the highest velocity being 30 miles from the north-east for a few minutes about 11 o'clock A. M. On the 9th, the wind changed from 6 miles in the early morning to 9 miles at midnight, the highest velocity being 13 miles at 9:30 P. M.

At Atlantic City, on the 6th, the wind changed from 4 miles from the west, in the early morning to 8 miles, from the same direction, at midnight, the highest velocity being 34 miles from the south for a few minutes about 7:12 P. M. On the 7th, the wind changed from 9 miles from the west, in the early morning to 13 miles, from the south-west, at midnight, the highest velocity being 18 miles from the north-east for a few minutes about 7:50 P. M. On the 8th, the wind changed from 13 miles, from the north-east in the early morning, to 9 miles from the south, at midnight, the highest velocity being 43 miles from the east for a few minutes about 10:55 A. M. On the 9th, the wind changed from 7 miles from the south-east, in the early morning, to 3 miles from the west at midnight, the highest velocity being 12 miles from the south-west for a few minutes about 3:37 P. M.

At New York, on the 6th, the wind changed from 7 miles from the west, in the early morning, to 17 miles from the north-west, at midnight, the highest velocity being 36 miles from the south-east for a few minutes about 9:45 P. M. On the 7th, the wind changed from 14 miles from the east, in the early morning, to 19 miles from the north-east, at midnight, the highest velocity being 30 miles from the north-east for a few minutes about 1:40 P. M. On the 8th, the wind changed from 17 miles from the north-east, in the early morning, to 9 miles from the south-east, at midnight, the highest velocity being 52 miles from the north-east for a few minutes about 2:52 P. M. On the 9th, the wind changed from 11 miles from the east in the early morning, to 4 miles from the south-east at midnight, the highest velocity being 17 miles from the south-east for a few minutes about 5:45 P. M.

There did not appear to be any real danger from the weather to sea-worthy barges until about the time of the accident. If a sheltered harbor had been then available, it would doubtless have been prudent to seek it but it was too late to turn back and the best course seemed to be to go on.

I do not find that any of the allegations of fault are sustained and the libel should be dismissed.