## THE FREDERICK E. IVES.[1]

### CONTINENTAL INS. CO. *v.* THE FREDERICK E. IVES.

(*District Court, S. D. New York.* October 30, 1885.)

1. TOWAGE—WEATHER INDICATIONS—REASONABLE JUDGMENT.
   Where the evidence fails to show clearly and decisively such signs of threatening weather as should forbid a tug with a tow from continuing on her course, the tug, when in charge of a competent pilot, should have the benefit of any reasonable doubt in the testimony.

[1] Reported by R. D. & Edward G. Benedict, Esqs., of the New York bar.

2. SAME—STATEMENT OF CASE—ERROR OF JUDGMENT NOT FAULT.

    The tug I., while towing a number of coal-boats through the sound, when about half way between Norwalk and Bridgeport, encountered a gale which cast away the tow. For the damage the insurer, having paid the loss, libeled the tug. The case turned on the question whether, when the tow passed Norwalk, the weather indications were such as to justify the tug in not putting into that harbor. *Held*, on the evidence, that the master of the tug was not clearly lacking in reasonable judgment in deciding to continue his course, and the tug not being liable for what subsequently proved to be an error of judgment, the libel should be dismissed.

In Admiralty.

*Carpenter & Mosher* and *R. D. Benedict,* for libelants.

*Wilcox, Adams & Macklin,* for claimants.

BROWN, J. On the twenty-third of December, 1884, the steam-tug Frederick E. Ives at Jersey City took in tow a number of "boxes," loaded with coal, bound for New Haven. On the way she put in at City island on account of the weather, and remained there until the morning of the 25th, when, the weather being bright and favorable, she proceeded on her way. At about 10 P. M., when about half way between Norwalk light and Pennfield light, which is at the entrance of Bridgeport harbor, she met, according to her captain's statement, a cross-sea from the eastward and from the northward, with a high northerly wind and snow, in which, after a couple of hours, the tow was broken up. Two or three boats were secured and taken into Bridgeport harbor; one sank almost immediately; several others drifted away to the eastward, and were afterwards found destroyed from two to ten miles from the place of the disaster. The libelants, who had insured the cargo, paid the loss, and brought this suit against the tug for negligence in transportation.

    The question of the liability of the tug, upon all the evidence, comes down to the question whether, at the time when the tug and tow passed Norwalk, namely, about 8 P. M., the appearance of the weather and other indications were such as to make it incumbent upon the pilot of the tug to take shelter for the night in Norwalk harbor, which he might have done; or whether it was consistent with ordinary nautical judgment and prudence to continue on in order to make the harbor at Bridgeport, 10 miles distant. A great deal of testimony has been taken in the cause, and no little difficulty exists in determining the direction of the wind,—one of the material circumstances,—when the tow was off Norwalk. Up to that time, certainly, there had been no difficulty, and no indications of any present danger.

    The Ives was one of the largest and most powerful boats of her class. She was thoroughly equipped for the service, and had a tender to render aid as necessary. The "boxes" loaded with coal were built for the service; and, loaded, they had about four feet free board. Two tows that left City island at the same time with the Ives, but had less speed and fell behind her, stopped for the night at Captain's island, a few miles to the westward of Norwalk. The witnesses from those tows, however, deny that there was anything threatening in the

weather at that time, or that they would have deemed it imprudent to continue on. It was Christmas evening, and they thought they would stop. The weather reports show that cautionary signals had been displayed during the day; that until afternoon the wind had been from N. W. to N.; that at 7 P. M. at New Haven the wind was N. E., 14 miles an hour,—at Captain's island, at about 5 P. M., it was N. N. W.; and that during the afternoon the sky became more or less covered with cirrous clouds, indicating more stormy weather, which were increasing towards evening. The captain of the Ives, however, testified that at 8 o'clock, when off Norwalk, the wind was to the northward, and light; that the moon and stars were shining, the water smooth, and that there were no indications to prevent his keeping on for Bridgeport, which, at his average speed of two and one-half miles an hour, he expected to reach a little after 12 o'clock. The captain of one of the tugs that put in at Captain's island testified that he observed the wind by compass at 11 P. M., when it was snowing, and that it was N. by W. The lighthouse keeper there testified that up to sundown the wind was N. N. W., and after that changed "a point or two." On cross-examination he says that at bed-time the wind was N. N. E.

Many other witnesses were examined on both sides as regards the direction of the wind; and the records kept at the Norwalk Light station were also produced. These records show evidence, not only of being carelessly kept, but, I regret to add, evidence of their having been to such an extent tampered with, as respects the entries concerning this storm, as to entitle them to no weight as they stand, and to prevent credit to the witness that made them. These records were not, however, introduced by the claimants, or made the basis of their defense. If the original entry, as seems probable, stated the wind to be from N. W. to N. E., the letter "E" being now erased, it is not certain to what hour the entry of N. E. referred; and there is a good deal of evidence in the case to show that at Norwalk the wind at 8 o'clock was to the northward. The greater number of witnesses so testify, though others make it from N. to N. E. That it was N. E. at New Haven there can be no doubt; and with that certain, the probability would seem to favor the fewer witnesses, who say that it was at that time about N. E. in the vicinity of Norwalk also. But in the first approaches of a N. E. storm, there is no proof of such uniformity in the wind at places 30 or 40 miles distant from each other as to exclude a possible difference of three or four points. Whatever might seem to be the natural probability, I cannot hold that the majority of witnesses are certainly in error in saying that the wind at Norwalk was about N. at 8 P. M., particularly as Worden's testimony would only make the wind from N. to N. N. E. at bed-time. Nor do I feel prepared to hold, in the absence of explicit evidence, that, even if the wind was N. N. E. at 8 P. M., it was *ipso facto* negligence for the Ives to undertake to continue her trip four hours longer to the

much better harbor of Bridgeport. Such a wind is doubtless unfavorable; but the approach of north-easterly storms is usually so gradual that I do not feel warranted in holding the mere continuance of a trip for so short a space of time to be negligence, unless there were other decided indications of speedy bad weather. I think the weight of testimony of the nautical men in this case is altogether against the existence of such clear or certain indications of bad weather at that time. The light-house keeper at Captain's island does, indeed, testify to threatening weather, and to his anticipations of trouble when the Ives passed there between 4 and 5 P. M. But as the wind was then undoubtedly from N. to N. N. W., I do not think his testimony entitled to great weight. It seems to be based more upon the event than upon the indications then existing.

The object of insurance is to cover the proper perils of the sea; but not, as respects the carrier, any neglect of ordinary judgment and nautical skill on his part. The carrier is bound to the exercise of reasonable judgment and skill; and if the loss happen through the want of either, the carrier must indemnify the insurer. In determining what constitutes reasonable care and skill, all the circumstances of the time and place, the capacity of the tug, the nature of the tow, and the length of the trip, must be taken into account. Nor can any exact criterion be found that does not necessarily still leave much to be determined by the judgment of the master formed upon the spot, and amid all the surroundings as they appeared at the time. On this subject, Chief Justice WAITE says, in the case of *The W. E. Gladwish*, 17 Blatchf. 77, 83, 84:

"This involved the exercise of judgment as to what ought to be done under the circumstances. A mere mistake is not enough to charge the tugs with any loss which followed. To make them liable, the error must be one which a careful and prudent navigator, surrounded by like circumstances, would not have made. * * * I cannot believe that ordinary prudence required an abandonment of the voyage, for the time being, by lying up or seeking a harbor. The tug was commanded by a competent master, and the captain of the barge was an experienced boatman. No objection was made by any one to going on, and it is evident that no person connected with the tow considered it necessary to stop." See, also, *The Clematis*, Brown, Adm. 499, 502; *The Allie & Evie*, 24 Fed. Rep. 745, 749, and cases there cited.

In this connection, the judgment of other captains and nautical men is competent, and entitled to much weight. Their judgment ought, indeed, to be controlling, if it were certain to be formed and expressed with impartiality. Making all just allowances for their presumptive bias in favor of the Ives, I cannot refuse considerable weight to the fact that the testimony of all the captains and pilots that were in the vicinity of Norwalk that night is that from sundown to 8 P. M., and even later, there were no such indications of bad weather as should prevent the Ives from going on. The fact, moreover, that none of the men upon the "boxes," some of whom had their families aboard, made any objection to going on, is negative evidence to the

same effect, of at least some weight. The captain of the Ives, moreover, had had considerable experience on the Sound, and had never met with any previous accident. He had no motive, so far as appears, for running any improper risks. There is no reason to doubt that his judgment was formed honestly and in good faith; and where the evidence fails to show clearly and decisively such signs of threatening weather as, according to the fair and reasonable judgment of persons of proved character and nautical skill, ought to forbid going on, the vessel should have the benefit of any reasonable doubt in the testimony.

Amid so much evidence in a controversy of so considerable importance, it is not surprising that there should be much diversity, and some difficulties about which it is hard to form any satisfactory judgment; but, upon the best consideration that I can give the case, I think the evidence fails to establish such clear evidences of danger and risk in proceeding onward from Norwalk to Bridgeport as warrants me in pronouncing the judgment of the captain at the time to have been unjustifiable or rash, or a negligent disregard of his duty. The libel is dismissed, with costs.