THE VANDERCOOK and THE THOMAS PURCELL, JR.

In re McWILLIAMS et al.

(District Court, S. D. New York. January 11, 1895.)

Tug and Tow—Threatening Weather—Imprudent Start—Tow Lost.

The tugs V. and P. took in tow 14 canal boats from New York, bound for Bridgeport, Long Island Sound. It was imprudent to start against an easterly wind because of the liability to meet heavy seas. A change of wind from the eastward to west of north is known to be usually followed, within about 12 hours, by a return of the wind to the eastward. The tugs about 12 hours after such a change to the northward started upon the trip at 6 p. m. They soon met the easterly wind, and before reaching Norwalk the tow was broken up by pounding in heavy seas with the loss of several boats. *Held*, that starting with such a tow was imprudent and negligent, and that the owners of the tugs were liable for the loss up to the amount of the value of the tugs.

In Admiralty. Loss of tow. Petition to limit liability.

Carpenter & Park, for petitioners.

Robinson, Biddle & Ward, for Pennsylvania R. Co. and British Marine Ins. Co.

BROWN, District Judge. At about 6 o'clock in the evening of November 9, 1893, the tugs Vandercook and Thomas Purcell. Jr., belonging to the petitioners, started from Hammond Flats with a tow of 14 canal boats and barges, bound for Bridgeport, including one boat to be left on the way at Stamford, and one at Norwalk. At about 3 or half past 3 a. m. of the night following, the tow broke up in an easterly wind and sea when about three miles to the westward of Norwalk, and more than half of the boats were sunk. Various claims having been presented against the owners of the tugs for damages, the above petition was filed to limit their liability to the value of the tugs Vandercook and Purcell; and at the same time the owners deny that there was any negligence for which they are liable. The answers to the petition charge negligence on the tugs, for improperly starting in the face of threatening weather, for insufficient tugs, and also for the failure to put in at practicable harbors on the route, before reaching the place where the tow broke up.

A great deal of evidence has been taken on the issue of negligence raised by the pleadings. The case is in some respects a close one. But taking all the circumstances into account, I am con-

strained to find that the start from Hammond Flats at 6 o'clock in the evening of the 9th was not a proper start; that the start at that time was not reasonably prudent for such a tow, with such tugs, and such a trip in the nighttime.

These tugs and tows, like several others, had been obliged to wait during the 8th of November, on account of a northeasterly wind all that day. The witnesses all agree that it is not prudent or safe to start with a flotilla of coal boats for a trip upon the Sound in the face of an easterly wind, even though the wind be light, and the weather clear; because a head sea is very likely to be met, which will cause the boats to pound or become swamped, and lead to the breaking up of the tow, and the loss of some or all of the boats.

Early in the morning of the 9th, the wind veered to the north, and remained between north and northwest all day; and the tugs and tow started from Hammond Flats (about a mile and a half west of Throgg's Neck) at about 6 p. m. The evidence shows that when the wind backs from the northeast to the westward of north, it is very likely to return again to the eastward before many hours, rarely exceeding 12 hours before its return. When these tugs left Hammond Flats at 6 p. m., the wind had already been 12 hours between the north and northwest, and its very speedy return to the eastward was, therefore, to be expected, though the wind at the time of starting was light, and the stars were shining. None of the other tugs with tows under these circumstances, so far as the evidence shows, considered it prudent to start, but continued to wait for proper weather.

The master of the Vandercook, who was chief in charge of the tow, had not been accustomed to the command of the Vandercook. This was his first trip upon her as master. The tow was not a light one for the two tugs, but nearly up to their full capacity. They were ordinarily expected to reach Norwalk—where there was a good harbor, easily approached—in eight hours. The distance was not over thirty-five miles to Norwalk; and when the tow broke up three or four miles to the eastward of Shepan Point, and about two or three miles to the westward of Norwalk, the tow was at least three hours behind the average time. From Shepan Point the sea began to roll in more heavily from the eastward, and it increased so much that there came to be a great deal of rolling, and pounding, between the boats. Finally, one boat in the head tier caught—probably by her guard—against an adjoining boat, which ripped up her upper plank streak, and caused her to take in water, from which she suddenly sank; and this led to the immediate break-up of the tow. That was the danger to be apprehended in encountering a head wind and a consequent easterly sea; the danger which it was known to be necessary to avoid. The witnesses for the tugs contend that there were no safe harbors to which the tugs could have safely taken such a tow as this, during the preceding six hours in the nighttime. The weight of testimony, I think, sustains this contention. But if this is correct, it only makes the obligations of prudence the more emphatic, that such a trip should not be entered

upon during the nighttime, when the probabilities are so strong that an easterly wind and sea will be speedily met.

In the case of The Allie & Evie, 24 Fed. 745, the start was not made in unpromising weather, and the damage arose from a sudden and unexpected squall. In the case of The Frederick E. Ives, 25 Fed. 447, the question was not one of a faulty start, but of the obligation to put into Norwalk harbor, instead of continuing on four hours further towards Bridgeport; and the weight of evidence was that at the time of passing Norwalk there were no such indications of bad weather as reasonably to prevent the Ives from going on. The case of The Robert Burnet was similar. 56 Fed. 266. In the present case the weather had been threatening for 12 hours previous. It was not settled. The trip was long, with no practicable intervening harbor in the nighttime after passing Cow Bay, only a few hours ahead; and the tugs before starting with the tow had already waited the full usual interval of temporary favorable weather, and started just at the time when bad weather was to be hourly expected. According to some of the evidence, the wind was already northeast when Cow Bay was reached, at about 8 or 9 o'clock p. m., where the tow might easily have put in.

To justify any start in such weather, the case must present exceptional circumstances in the staunch character of the tow itself, and the shortness of the trip; while the tugs should not only have full general fitness for the work, but such a reserve of power for service in emergencies as will fully offset, and prevent, the dangers expected to be met by ordinary tugs and tows in bad weather. Neither the boats of this tow, nor the tugs, had any such exceptional character. They had no fitness for such a trip, undertaken at such a time; and I must hold the tugs, therefore, liable for lack of reasonable prudence in starting with such a tow at a time when the bad weather that followed was according to all experience, and within the ordinary knowledge of boatmen, to be hourly expected. The petitioners are entitled to limit their liability to the value of the tugs.