## THE E. V. MacCAULLEY.

## THE IVANHOE.

### RILATT et al. v. THE E. V. MacCAULLEY et al.

(District Court, E. D. Pennsylvania. January 7, 1898.)

1. TOWAGE—LIABILITY OF TUG OWNERS.

Tug owners are not insurers of the safety of their tows, but are only responsible for the exercise of such care as the service requires, and cannot be held liable for a loss in the absence of proof of carelessness. Error of judgment respecting the weather at the time of starting, or in other respects on the voyage, is no ground of liability.

2. SAME.

Where the captains of tugs engaged to tow a dry dock from Hoboken to Philadelphia waited three days while the wind was eastward and the weather bad, and on the following morning, finding the wind in the northwest, the sky clear, and the storm signals taken down, started on the voyage, but encountered rough weather, resulting in the loss of the tow, held, that their failure to observe or heed the fact that the wind had passed around from the east northward instead of southward, was not negligence, as it did not sufficiently appear that a change in the one way rather than the other indicated a shorter period of good weather.

**8. SAME—DEFECTIVE HAWSER.**

Alleged defects in the hawser are not sufficient to charge the tug with negligence, where it appears that the hawser did not break until the tow was sinking, and therefore was free from any defects contributing to the disaster.

This was a libel by Rilatt Bros. against the tugs E. V. MacCaulley and Ivanhoe, to recover damage for the loss of a tow.

Henry Flanders and Edward F. Pugh, for libelants.

John F. Lewis and Francis C. Adler, for respondents.

BUTLER, District Judge. The suit is for damages, alleged to have resulted from carelessness in towing a dry dock from Hoboken, on a voyage to Philadelphia, the dock being lost in a storm on the way.

There is no difficulty about the law applicable to the case. The respondents were not insurers, but were responsible for the exercise of such care as the service undertaken required. They cannot be held liable for the loss sustained in the absence of proof that it resulted from carelessness. Error of judgment respecting the weather at the time of starting, or in other respects on the voyage would be unimportant.

The libelants' case was put at the hearing on three specifications of alleged carelessness; others charged in the libel were not urged, and will not therefore be considered. The first of the specifications pressed is that the respondents should not have started when they did; the second, that the hawser was insufficient for the service; and the third, that a harbor should have been sought before the storm was encountered. Should the first specification be sustained? The respondents had waited three days, while the wind was eastward and the weather bad. The next morning, finding the wind in the northwest, the sky clear and the storm signals taken down, they started. The charge of carelessness in thus starting is based on an allegation that the wind passed around from the east northward instead of southward. If the allegation is true, (and it rests on the testimony of the libelants' agent Griffen, who does not appear to have communicated this fact to the masters of the tug), I do not think it sufficient to convict them of carelessness. They could not be expected to remain up all night for the purpose of observing how the wind passed to the northwest; and even if they had been aware that it passed northward I do not think they would have been guilty of carelessness in starting, in view of the circumstances that the sky was clear, the wind in the northwest, the storm signals down and other vessels going out. I do not attach much importance in this respect to the case of The Vandercock, 65 Fed. 251. Whether the duration of good weather will be longer when the wind passes westward from eastward in one direction than when it passes in another is not a question of law, but of fact about which there is certainly room for difference of opinion. Probably a majority of intelligent persons would say that the direction in which it passes is unimportant. At least one experienced witness says it certainly is not important on the Jersey coast. At any rate there is no evidence in this case sufficient to prove that the passage northward is such an indication of bad weather as should render one

who disregards it chargeable with carelessness. The captains of the tugs had been careful not to start until the weather cleared and the wind went to a quarter indicative of good weather. They had no motive to start until they believed the storm had passed; on the contrary their own safety depended on the exercise of care in this respect. It was impossible to tell how long the weather would continue good; it might be of short duration whether the wind went round in one direction or another. These captains had long experience in navigation on this coast, and were especially qualified to judge of the propriety of starting. The officers in charge of the signal service believed the weather safe for vessels going out, and therefore took down the storm signals which had been up; and many vessels started that morning. It is true that the tow was unwieldy; but I do not think the respondents can justly be held guilty of carelessness in starting under the circumstances.

Were they careless as respects the hawser—was it unsafe? It was an eight-inch line, new within a year. That it was large enough, if in good condition, I do not doubt. The expert testimony is clear in this respect. Was it in good condition? It drew out of the thimble off Sandy Hook, but this, as the testimony shows, frequently occurs with good hawsers; and when refastened it was safe in this respect and held, even when the tow sank. Griffen says it did not pull out of the thimble but broke at this point. The weight of the testimony is, however, against his statement. It did break when the tow was virtually submerged, just before sinking. But I do not deem this evidence of faultiness. At that time the waves drove the tow back and forth, subjecting the hawser to jerking, and sawing on the bits such as would, I think, necessarily break it even if in excellent condition. Griffen, who was on the tow, testifies that he noticed when, as he says, the hawser broke off Sandy Hook, the strands at the broken end, and saw they were worn. He is contradicted by many witnesses in the statement, that it broke at this point, and his testimony that he then observed its worn and unsafe condition is improbable. At this time a harbor was within convenient reach, and it seems incredible that he should have gone on at the risk of his life without calling attention to the danger thus manifest, if his testimony is true. Two witnesses, Gokey and Williams, testify that the captains of the tugs declared before starting on the voyage, that the hawser was "very bad." This also seems improbable. It is certainly unlike the conduct of such men when entering upon such a service. The captains, who have no more interest in the subject than Gokey and Williams, deny positively making such a statement. They and a number of other witnesses called by the respondent, testify that the hawser was good, and safe for the service. After careful examination of all the evidence on this subject, I think a finding that the hawser was not safe would be unwarranted. Indeed, I think the weight of the evidence sustains a conclusion that it was. It held under the strain of both tugs and the tempestuous sea until Griffen, who as has been stated was on the tow, saw that it must go down, and demanded to be taken off. At this time, as he distinctly testifies, the dock was doomed; no hawser would have saved it. It must break loose, go to pieces,

or take the tugs with it. The tug which was cast off to rescue Griffen was not again attached because, as I suppose, it was seen that such attachment would be useless. The only probable effect of making it would have been to hasten the catastrophe. As the dock was sometimes driven towards the tug attached the latter would hasten forward to tighten the line, and then a counter wave would drive the dock back, and the jerk thus caused on the line would produce a strain that would have been likely to part it sooner if the weight and force of the two tugs had been encountered at the forward end. That it endured the strain to which it was subjected by the storm, so long as it did seems to demonstrate that it was in good condition. It held until the situation was such that no hawser would have saved the tow. It was lost as a consequence of the storm, and not of the condition of the hawser. This conclusion is, I think, fully warranted by the testimony on both sides. Nor do I think the respondents were remiss in not turning back to seek a harbor because of indications of bad weather after starting, or when the storm arose. There were no such indications, in my judgment, of a reliable nature, until the storm was imminent, as required them to seek a harbor, and afterwards turning back against the wind would, I think, have augmented the danger.

The libel must be dismissed.