## THE E. S. ATWOOD.

### Petition of DALZELL et al.

(Circuit Court of Appeals, Second Circuit. April 9, 1923.)

### No. 201.

1. **Collision ⬅73—Tug, permitting tow to come in collision with anchored vessel, has burden of explanation.**

   The fact that a tow came in collision with an anchored vessel puts a serious burden of explanation on the towing tug.

2. **Collision ⬅71(2)—That a tow steers badly places greater burden of care on tug.**

   That a barge in tow, which came in collision with an anchored vessel, steered badly and had a tendency to sheer, does not exonerate the tug, but that fact placed on the tug the duty of greater care.

3. **Collision ⬅71(2)—Tug held in fault for collision between tow and anchored vessel.**

   A collision between a heavy barge in tow, which steered badly, and an anchored vessel, *held* due solely to the fault of the towing tug in not keeping at a safe distance, in view of the effect of the tide and the known tendency of the barge to sheer.

4. **Collision ⬅25—Liability assumed by express contract not subject to limitation.**

   A charterer of a tug, which in its contract of towage agreed to be answerable for all damages from collision arising through negligence of its employés, cannot limit its liability for such damages.

5. **Collision ⬅25—Owner of tug under charter held entitled to limit liability for collision.**

   The owners of a chartered tug *held* entitled to limit liability for a collision for which the charterer's employés were in fault.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Petition of W. Freeland Dalzell and others, as owners, and Fred B. Dalzell & Co., Inc., as charterer, of the steam tug E. S. Atwood, for limitation of liability. From the decree, the Guidera Towing & Transportation Company, Inc., and others appeal. Reversed.

The individual petitioners are the owners of steam tug Atwood, and the corporate petitioner is her charterer, which at time of injury complained of manned, victualed, and navigated the vessel at its own expense, etc. This charterer (Dalzell & Co., Inc.) made a contract with the United States, whereby the corporation agreed to "furnish tug service for transoceanic vessels in and about New York Harbor." In furnishing such service, the contracting charterer agreed to employ certain tugs (including the Atwood) "and/or such other tugs as the contractor may designate." The written agreement under which tug service was to be furnished continues as follows: "The contractor will be held responsible for all damage to vessels in the service of the quartermaster while under tow or being shifted, and he shall be held answerable for all damages that may occur to persons, property, animals, etc., or from collision or want of proper lighting, arising through negligence on the part of himself or his employees or trespassers."

In pursuance of this agreement the United States, through its Quartermaster's Department, directed Dalzell, Inc., on October 6, 1918, to convey United States barge Overseas No. 7 through the upper harbor to Gravesend Bay, where she was to be put in tow and convoy for France, laden with coal. No. 7 was a large and heavy barge, and the tug Alfred (in no way controlled

by Dalzell, Inc.) was employed to act as helper. The master of the Atwood was in charge, and after getting out of the slip arranged No. 7 in tow on a short hawser. A considerable distance below the starting point, the Alfred made fast alongside to assist, not only in towing, but in steering. The tow started about 10 p. m. and encountered no conditions of wind or weather materially interfering with navigation. War prevailing at the time, the Narrows were barred by an antisubmarine net, through which there was a passageway near the Staten Island shore. Near this gap was a guardship, and the passage through the net could only be used after hailing the guardship and proving permission to go through.

For some time before October 6th, the United States steamship Amphitrite had been the guardship, but on the night mentioned, and some days before, she was not in service, but was lying at anchor not far from the southerly end of the Red Hook anchorage; another vessel was acting as guardship. As found by the court below, the No. 7 steered very badly; she had a strong tendency to sheer, and owing to her weight was difficult to control, and she did sheer while going down the harbor, despite the efforts of the Alfred.

The master of the Atwood, mistaking the Amphitrite for the guardship, laid a course near enough to that vessel to hail her through a megaphone and get permission to go through the net passage. According to his own story, he approached the Amphitrite with the latter vessel on his port bow, and got within approximately 100 feet of her when he hailed by megaphone and was told to report to the new guardship, which was further down the Bay. Then (said the Atwood's master): "A. I looked back and I seen the barge take a sheer to starboard. Q. Then to the westward? A. Yes; I tried to break that sheer. Q. How did you try to break it? A. By putting my wheel hard aport. Q. Then what happened? A. She took too much of a sheer, and the ebb tide took her on the port quarter, and she sagged right down on the bow of that Amphitrite. * * * I think she struck pretty well forward on the port side."

So far as the apostles show, the tide runs true at the point of collision. The Amphitrite was heading north, and the Atwood's course was substantially south, though her master's nearest approach to giving a compass bearing is the statement that his "compass was heading south and east." No. 7 struck the ram of the Amphitrite; the Alfred was caught between barge and war vessel, and received considerable injury; the No. 7 herself sank, with great loss of property. The owners and charterer of Atwood join in this petition for limitation. The owners of the Atwood and the United States appeared as claimants, together with their insurers.

The court below held that the sole cause of damage was the bad steering or tendency to sheer of the No. 7, and so wholly exonerated the Atwood and the petitioners. From decree accordingly all the claimants appealed.

John Kennedy White, Sp. Asst. U. S. Atty., of Buffalo, N. Y., for the United States.

George V. A. McCloskey and Foley & Martin, all of New York City, for the owners and underwriters of the Alfred.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Frederick Pennell, both of New York City, of counsel), for appellees.

Before HOUGH and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

HOUGH, Circuit Judge (after stating the facts as above). [1] We pass to consideration of the navigation of the Atwood, without deeming it necessary to comment on certain claims made by appellant United States concerning the alleged undermanning of the Atwood and the personal habits of her master. There is nothing in these suggestions.

The outstanding fact about this collision is that it occurred on a night when no difficulty of navigation is suggested, between a tow in charge of a full-powered tug and a vessel at anchor. The very fact that such a collision occurred puts a very serious burden of explanation upon the tug in charge. Indeed, it has been said that the vessel producing such a collision is "presumptively at fault." The Gulf of Mexico (C. C. A.) 281 Fed. 77.

[2] It may be admitted, as correctly found by the court below, that the No. 7 steered wretchedly, and owing to her size and weight she manifested this vice almost as much with the Alfred alongside as she did before. But the truer all this is, the plainer it was; and since the Atwood had undertaken to tow a vessel scarcely fit to steer, it was incumbent upon her the more carefully to guard her helpless tow against the consequence of its own vices. The Atwood had plenty of time to observe the habits of No. 7 and to see that the Alfred was unable to correct them. Thus the duty of the Atwood was measured, not by what she might have expected from a properly built and handily steering tow, but from a tow known to be clumsy and perhaps at times unmanageable.

[3] The explanation given by the Atwood and quoted in the statement prefixed to this opinion is in our judgment sufficient to condemn the Atwood's navigation. On the course indicated (however sketchily) by her master, the Atwood, with the Amphitrite on her port bow, had but to go to starboard to leave that vessel safely behind on her way to the guardship. Apparently at the very moment of learning that the Amphitrite was not the guardship the No. 7 was seen to sheer to starboard; i. e., to the westward, and therefore away from the Amphitrite. Thereupon the Atwood ported her own wheel, and yet No. 7 lodged on the Amphitrite's ram bow, with the latter vessel heading north. It is not too much to say that this story is an impossibility; collision could not have happened as thus stated and to put the tale in this manner indicated considerable perturbation of mind.

In our judgment the Atwood miscalculated the ebb tide, went too near the Amphitrite for safety in and with the tide, suddenly found herself in a situation from which there was no escape, and has fallen back on the bad steering of No. 7 for an excuse. We think the excuse has not even the merit of plausibility. The value of the Atwood must therefore be devoted to the payment of these claims. No fault is alleged or proven against the Alfred, and the inability of No. 7 to steer not being the result of any bad management, and being known, cannot be used for dividing or otherwise reducing liability.

[4] Dalzell & Co., Inc., are bound by their contract. If they had done no more than engage to tow or furnish towboats, they would fall within The Ice King (C. C. A.) 261 Fed. 897. But the contract went much further, for by it the contracting corporation agreed to be answerable for all damages from collision arising through negligence on the part of its employees, and the master of the Atwood was such employee. We think this a clear case for the application of Pendleton v. Benner Line, 246 U. S. 353, 38 Sup. Ct 330, 62 L. Ed. 770, and Luckenbach v. McCahan, 248 U. S. 139, 39 Sup. Ct. 53, 63 L. Ed.

170, 1 A. L. R. 1522. Consequently the petition of the charterer must be denied, on the ground that it is bound by its personal engagement.

[5] No reason is seen why the owners of the Atwood cannot limit their liability against (so to speak) the consequences of the negligence of their charterer's servant. They made no engagement with the government, and had no other contract outstanding (so far as shown) at the time of disaster, except one with the charterer. We think this part of the case ruled by Richardson v. Harmon, 222 U. S. 96, 32 Sup. Ct: 27, 56 L. Ed. 110, as explained and applied in The Soerstad (D. C.) 257 Fed. 130.

It may be admitted as true that the chartering and contracting corporation is but an arrangement, perhaps even a "family arrangement," by which the management of vessels having many owners in common is put in charge of a corporation composed of selected business men from among the whole mass of owners. This is a lawful method of doing business, tainted with no fraud. The contract in evidence must be enforced against him that made it, but it affects no one else. It thus appears that the United States has recourse to two funds, whereas the owners and underwriters of the Alfred are confined to one. It follows that, before coming upon the fund derived from the value of the Atwood, the United States must exhaust its remedy against Dalzell & Co., Inc.

Decree reversed, with one bill of costs to the appellants against Dalzell & Co., Inc., and the cause remanded to the District Court, with directions to proceed with the limitation petition in a manner not inconsistent with the foregoing opinion.