THE OTSEGO.

THE CHARLES A. FOX.

THE McNAUGHTON.

No. 9273.

District Court, E. D. New York.
May 19, 1930.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Arthur H. Longfellow, Sp. Asst. to U. S. Atty., of New York City, of counsel), for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark, Leonard J. Matteson, and P. Fearson Shortridge, all of New York City, of counsel), for respondent and the Charles A. Fox.

BYERS, District Judge.

On January 17, 1919, the steamship Otsego, in the United States Army Transport

Service and owned by the United States of America, was towed from the Bush docks in Brooklyn, to Fletcher's dry dock, Hoboken, N. J., by Fred B. Dalzell & Co., Inc., with which company a contract of towage had been entered into on the part of the government, which contract is Libelant's Exhibit A.

The tugs employed by the contractor for this purpose were the Charles A. Fox, the Edward T. Dalzell, the Dorothy McNaughton, and the John A. Bouker, according to the libel.

The steamship was dead, and her steering gear out of commission at the time in question, according to the testimony of her then chief officer. Also the vessel was light.

As the Otsego was being warped into the slip at Fletcher's, her port side, at or just aft of the forward rigging, came into contact with the starboard quarter of another vessel then occupying a portion of the slip, namely, the Ohioan.

For the damage so said to have been occasioned to the Otsego, a libel was filed on June 21, 1926, a matter of seven years and over five months later.

It seems to be the law, that what would be laches, as between private suitors, does not impair the rights of the government to proceed in admiralty in its sovereign capacity: the discussion of this subject in U. S. v. Alex Dussel Iron Works (The Sacandaga) 31 F. (2d) 535, 1929 A. M. C. 573 (C. C. A.), is too recent to admit of doubt as to the present state of the law.

In the practical sense, however, the long delay has operated to the detriment of the government, as well as the claimant, as will be observed from the testimony of the only two witnesses who professed knowledge, at the time of hearing, of what took place over eleven years prior thereto. The memory of one was extremely limited, although refreshed in part by examination of a statement made by himself at the time; the other witness seemed to be well able to recall much of what took place, and the weight of his testimony remains for consideration.

The contract in question imposed upon Fred B. Dalzell & Co., Inc., responsibility "for all damage to vessels in the service of the Quartermaster while under tow or being shifted, and he shall be held answerable for all damages that may occur to persons, property, animals, etc., or from collision or want of proper lighting arising through negligence on the part of himself or his employees or trespassers."

The burden assumed by the government was that of establishing, by a preponderance of evidence, that the damage said to have been suffered by the Otsego occurred through negligence on the part of the Dalzell Company, i. e., its representative in charge of the towage operation. Such was declared to be the meaning of this contract in The E. S. Atwood (C. C. A.) 289 F. 737.

Has the government sustained that burden?

The witness Warren, who was the chief officer on the Otsego at the time, was on the forecastle as the ship was towed to Fletcher's. He says that, on arrival there, the tide was strongly ebb, but whether it had just turned, he does not state; the weather was clear, but the hour or approximate time involved is not stated. He says that from three to four hours were occupied in trying to get into the slip, and that the tide was the main difficulty; also that there was damage to the Otsego as the result of contact with the Ohioan.

This witness' memory does not enable him to say what cargo had been carried on the home voyage from France, ending December 21, 1918; nor what kind of repairs were the occasion for taking the ship to Fletcher's.

So far as the question of negligence is concerned, Mr. Warren's contribution to the evidence is neutral.

The only other witness called by the libelant was Robert F. Powers, captain of the tug McNaughton. He says his tug led the tow, with a hawser made fast at or near the bow of the Otsego, the McNaughton being an indefinite distance in advance of the Otsego. The tugs Dorothy and Fox were made fast alongside the Otsego, to port, in the order named; and the Edward T. Dalzell was made fast alongside to starboard. See Libelant's Exhibits B and C.

Thus Powers introduces the tug Dorothy not named in the libel, and drops the tug Bouker therein referred to. This may or may not be a material circumstance, but has its bearing on Powers' narrative.

As the tow approached the slip, it appears that there was an oil barge lying alongside the outboard end of the northerly pier, and the rough sketch made by this witness, constituting Libelant's Exhibit C, shows that this barge was longer than the end of the pier, and extended somewhat into the slip between the northerly and southerly piers in question.

Also it appears that the slip was in part occupied by barges ranged end to end at the

northerly side of the southerly pier, and alongside of them was the steamer Ohioan.

The captain of the tug Fox, whose name Powers does not remember, was in charge of the maneuver, stationed on the bridge of the Otsego; the latter was towed abreast of the northerly pier and stopped. Two lines were passed to the pier and the ship was allowed to sag and a strain taken on these lines.

Powers was then told to "let go, and help pull the stern of the ship up and try to work her into the slip."

Powers took his tug aft alongside the ship, and ranged ahead of the tug Dalzell (which had let go her bow and spring line, and worked her head away from the ship), and Powers passed a hawser to the bow of the Dalzell, and both tugs then pulled that way and "started the stern of the ship up slightly, worked her bow in the slip, across the stern of the ship Ohioan."

The witness was so engaged an hour or more; then the captain of the tug Dalzell required the witness to let go, as the port rail of the tug Dalzell was being pulled under water, which made it dangerous for the latter.

Meanwhile the Fox and the Dorothy were shoving head on against the port side of the ship. Having let go her hawser to the Dalzell, the McNaughton went around and took up a position on the port side of the ship head on and shoved also. The witness was working on the job in all about three hours, before "we got into the slip."

The collision between the Otsego and Ohioan occurred while the McNaughton was on the starboard side of the former, with its hawser passed to the Dalzell. Powers says he saw the collision and the damage being done, and that the only orders he received were from the captain of the Fox on the bridge of the ship, and from the captain of the Dalzell, requesting the letting go of the hawser as stated.

Based on his experience in towing and docking vessels, he was asked if on January 17, 1919, with the tide such as it was, he would have proceeded to dock the Otsego in the way the captain of the Fox did, and he answered in the negative; he said he would have anchored the ship until slack water.

On cross-examination, he would not say this started off as a bad job. He knew it was a dangerous movement, but did not say anything about it, observing that he did not have charge of the ship.

The McNaughton has been petitioned into this proceeding, and the petition alleges that it was her failure to obey orders, and to proceed full speed ahead with her stem against the port quarter of the Otsego, which resulted in the latter's sagging down on the starboard quarter of the Ohioan.

Process against the McNaughton has not been served, because she has not been in these waters since June of 1919, having been taken to Canada by the witness Powers at that time.

Powers does not remember the name of his mate at that time; he made a statement to some Army Board, which he had recently consulted.

That is the libelant's case.

In seeking to conclude whether negligence has been shown, guidance is found in the following statement from an opinion of the Circuit Court of Appeals, Second Circuit, as follows:

The Clarence L. Blakeslee (C. C. A.) 243 F. 365, 366:

"HOUGH, Circuit Judge (after stating the facts as above).

(1) The rules regarding litigation such as this have been plainly and repeatedly stated by this court. The mere fact that a tow receives injury does not render the tug liable; libelant must affirmatively prove negligence, which is not presumed merely because the injury is not otherwise accounted for. The Winnie, 149 F. 725, 79 C. C. A. 431. The tug is not an insurer, and is not responsible for a master's error of judgment. The W. E. Gladwish, 196 F. 490, 116 C. C. A. 185. Navigators are not to be charged with negligence, unless they make a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown. The Nannie Lamberton, 85 F. 983, 29 C. C. A. 519. The line of demarcation between error of judgment and negligence is indicated in The E. B. Conine, 233 F. 987, 147 C. C. A. 661. The Frederick E. Ives (D. C.) 25 F. 447, shows facts quite like this case. * * *

"However this may be, libelant cannot recover without affirmatively showing some act of negligence on the part of the tug, proximately resulting in injury to his boat. This has not been done, and the decree below is reversed, with costs in both courts."

See also The W. H. Baldwin (C. C. A.) 271 F. 411; The Eastern (C. C. A.) 280 F. 711; and The Caspian (C. C. A.) 14 F.(2d) 1013.

 Having in mind, then, that the mere contact between the two ships, when the Ot-

sego was entering the slip, does not of itself establish negligence, it will be seen that the libelant has not sustained its burden of proof in light of the following considerations:

(a) It has not been shown how much area of maneuver, within the slip, was available to the Otsego when entrance was sought. Neither the width of the slip has been shown, nor the dimensions of the vessels in partial occupancy.

(b) The force and direction of the wind at the place in question have not been shown, which precludes an estimate of the extent to which the captain of the Fox should have reckoned with that element.

(c) The dimensions of the Otsego have not been shown, nor the extent of freeboard which was exposed to the action of the wind, if any.

(d) It has not been shown whether there was steam enough on the Otsego to operate her anchor, in the event that she should have been brought to anchor, as the witness Powers opines. Nor have accurate data as to tidal conditions been produced.

(e) Nothing is shown as to the handling of lines to the northerly pier, and whether there was error or failure in respect thereto, and, if there was such, who was responsible.

(f) The fact that the tugs Dalzell and McNaughton, exerting power off shore from the stern of the Otsego, started her stern up slightly, as Powers says, tends to vindicate the judgment of the captain of the Fox in attempting the maneuver. The subsequent lack of success has not been traced to a cause for which the one in charge must be held responsible on the theory of negligence.

If there was error in making the attempt, it would seem that the result would have been more rapid than it was, for an effort which did not fail within an hour can hardly be thought to involve palpably bad judgment, at least to the extent required to sustain libelant's burden of proof.

The mere fact that Powers stated, after the accident by a matter of eleven years, that he would not have undertaken it, adds little to the available information today.

He was on the starboard side of the Otsego, having a hawser on the bow of the Dalzell, at the moment of contact, and, if he was giving attention to his own tasks at that time, his opportunity to see what was taking place in the slip was not of the best, to put the matter mildly.

The claimant called Nilson, the captain of the Fox, and he testified that the entire oc-

currence had escaped his memory, even though he was confronted with a statement made by himself to the Army Board, within a week after January 17, 1919. He said he had even forgotten the making of the statement; nothing in his attitude or manner of testifying tended to his discredit as a witness.

Perhaps, if the libelant had been diligent in proceeding under the evidence gathered so promptly, its proof would have enabled it to prevail.

The absence of witnesses, who are presumed to have been available to the claimant within a reasonable lapse of time subsequent to the month of January, 1919, has been satisfactorily accounted for. The change in the corporate name of the respondent has been explained, and claimant may take a decree dismissing the libel.