## THE BRITANNIA.

### (District Court, S. D. New York. January 25, 1905.)

**1. TOWAGE—LOSS OF TOW BY STRANDING IN STORM—LIABILITY OF TUG.**

A tug, with a ship in tow, bound from New York to Baltimore in February, having failed to make out the Cape Charles Light late in the afternoon, owing to snow and fog, overran her course to enter the bay, and continued until she found by soundings that she was near the Virginia coast, when she turned and attempted to go to sea against a strong wind. Owing to the high freeboard of the ship, and also to the improper bracing of her yards, the tug was unable to make any headway, and the ship finally stranded on the beach and was lost. *Held,* under the evidence, that the tug exercised the skill and ordinary care required of her, and was not liable for the loss; the course taken by the master, although it proved not to have been the best, having been justified by the conditions as they then appeared.

In Admiralty. Suit against tug for loss of tow.

Wing, Putnam & Burlingham, for libellant.
Butler, Notman, Joline & Mynderse, for claimant.

ADAMS, District Judge. This action was brought by the California Shipping Company, as owner of the ship Henry B. Hyde, to recover from the tug Britannia the damages, said to exceed $40,000, caused by the stranding and loss of the ship in the early morning of the 11th day of February, 1904. The ship was taken in tow at the Erie Basin, New York, about 2 o'clock p. m. on the 9th day of February to be towed to Baltimore, and went ashore on the Virginia coast, about 13½ miles south of Cape Henry.

The Hyde was a full rigged wooden ship of 2449 tons net register. She was 267 feet long, 45 feet wide and had a depth of hold of 29 feet. She was manned with a crew of 8 New York riggers, experienced seamen, together with a master, chief officer, carpenter and steward. She carried 500 tons of ballast and 641 tons of coal, giving her a draft of 16.6 feet forward and 17 feet aft. The distance from the water to the top of the ship's rail amidships was 20 feet.

The Britannia was a sea-going tug of 650 horse power, hailing from Baltimore. Her length was 132 feet, her width 25 feet and her depth 12½ feet. She carried a crew of 12 men all told and was engaged in harbor work and the general towing business from the ports of Baltimore, Boston, Philadelphia, New York and of Porto Rico and Cuba.

The tug was engaged by the agents of the Hyde to tow the ship from New York to Baltimore, where the latter was chartered to load a full cargo of coal for a voyage to San Francisco. Pursuant to the

towing contract, the tug arrived in New York Harbor in the early morning of February 8th with the expectation of starting on the voyage to Baltimore at noon of that day but owing to a northwest wind having created a low tide, the ship could not get out of the Erie Basin where she was lying and the start was deferred until the next day.

Upon the arrival of the tug on the 8th, her master was informed by the master of the ship that the ship would not carry a pilot as the one engaged had been delayed in Baltimore. The ship master concluded not to take one although he was informed that owing to the delay in starting there would be ample time to bring him on.

The tug and tow left New York in the early afternoon of the 9th of February in fine clear weather with a light northwest wind. Before going to sea a hawser from the tug of from 200 to 225 fathoms in length was shackled to 4 or 5 fathoms of the ship's starboard anchor chain and remained in use. The voyage proceeded without noteworthy incident until the afternoon of the 10th, when shortly before 3 o'clock snow commenced to fall but did not immediately create any difficulty in navigation as it lit up enough about 3:30 o'clock to show Hog Island Light abeam about six miles distant, but soon shut in thick again. The tow then proceeded at the rate of about 9 knots an hour. The course from the Hog Island Light to the next point of departure, Cape Charles Lightship, distant some 18 miles, was S. W. ½ S. It was expected by the tug that she would reach there about 5:30 o'clock. At that hour it was snowing heavily and some fog prevailed, with considerable wind from the N. N. E., and the expected light not being seen, the tug steered W. S. W. with the intention of making the regular course of S. W. by S. to the whistling buoy off Cape Henry, the tendency of the wind and sea being to carry the tow to the southward. The calculation of the master of the tug was that this course would carry the tow close enough to the whistling buoy to hear it.

The ship had, about 6 o'clock in the morning of the 10th, set the lower fore and mizzen topsails, and later the lower mizzen topsails by direction of the tug, given by a previously arranged code of whistle signals. All sail was taken in between 6 and 7 o'clock P. M. by direction of the tug.

Soundings were regularly and frequently taken by the tug from about half past 5 in the afternoon with a view of working in to the bay between the capes before the threatened storm should burst. These soundings at first ran 7, 7½ and 8 fathoms, then 5, 5½ and 6, and up to 9, then diminished to 5, 4½ and 4.

When 4 fathoms were found, the master of the tug, not having heard the whistling buoy and in fear of being too close to the beach, wanting to get off shore, hard-a-ported the helm of the tug and gave a corresponding signal to the ship. The change of the tug, with a reduction of speed, brought her to about a N. N. E. heading, from which direction the wind was blowing. This manoeuvre occupied 5 or 10 minutes, when the engines of the tug were put at full speed again and, it is said, were kept continuously so until the ship went aground. The ship obeyed the signal to port and at the same time braced her yards sharply to port, without direction from the tug, under a presumption that the tow would soon be heading up the bay and with the wind from the N.

E. the towing would be eased by so bracing the yards. The tug got a heading of about N. N. E. or N. E. by N. but although she continued to carry a port helm she could not get any further because the ship hung on her starboard quarter, with a heading of about E. N. E., the tug being about 4 points on her port bow and the ship bearing about the same on the tug's starboard quarter.

The wind from 6 o'clock P. M. up to midnight of the 10th, varied in force from 35 to 44 miles and in direction from north to northeast. The tide was flood at Cape Henry at 4:35 in the morning of the 11th.

The vessel and cargo were said to be a total loss. No lives were lost, all on board being saved by the use of the breeches-buoy from the Dam Neck Mills Life Saving Station in the morning of the 11th.

The original charges of fault in the libel were:

"Fifth. The stranding and loss aforesaid were not caused or contributed to by any negligence on the part of the ship Henry B. Hyde or those in charge of her, but were due solely to the negligence of those in charge of the steam-tug Britannia, in not ascertaining and keeping her position and observing the lights along the coast; in not bringing the ship into Hampton Roads where there was a safe anchorage; in not holding the ship off and keeping her in safe water; in not casting the lead, but allowing the ship to drift with the tide and current until she grounded; in giving no signals to the ship and doing nothing to keep her off the shore; in making no attempt to save the ship after she got into a position of danger; in abandoning the ship when she was in a position of danger.

"At the time of the accident although the weather was thick with snow and the wind was blowing strong, there was nothing in the conditions to prevent the tug from taking the ship safely in to Hampton Roads, or if she preferred to remain outside, from keeping the ship on soundings in deep water."

At the time of the trial an amendment charged as an additional fault: in not anchoring the Hyde outside, in case it was not deemed safe to enter the roads.

The answer, after denying the charges of fault, alleges:

"Seventh. The weather and sea through the latter part of 10th February and until the morning of 11th February were fierce, and the disaster occurred by reason of the perils encountered, and not through any fault or negligence on the part of those navigating the tug. From the time of finding themselves in shoal water by soundings, the tug was unable in spite of all efforts, to regain deep water, and in the judgment of the master which was, as the claim-ant avers, good judgment, he continued those efforts until after the ship stranded and until the tug herself touched bottom."

At the time of the trial, an amendment to the answer, on the testimony already taken, was offered as follows:

"I want to charge that the difficulties of the tug were increased by the unskillful conduct on board the Hyde in holding their helm to port con-tinually, and in bracing their yards to port and keeping them so braced."

The libellant urges that according to the tug master's own testimony there would have been no difficulty in going further to sea with the tug when he failed to get a new point of departure at Cape Charles. The master says he did not do so because he did not think it prudent as there was a gale coming on and he wanted to get the ship off Cape Henry. He did attempt to get to sea when he discovered from the soundings that he had overrun the distances and he then purposed to put off to sea and anchor until the weather cleared up. He could have

attempted the manœuvre earlier and perhaps with success. Probably in the light of subsequent events, it would have been better, but his failure to make the effort earlier was not apparently such a fault as should condemn the tug.

Another criticism made upon the tug's action was that she did not anchor when it was found that she could not make any headway with the ship against the gale. Up to the time of the discovery that the ship was in 4 fathoms of water, the soundings indicated that a proper course had been made and the master did not deem it prudent to anchor. The stress of the storm had not come when at Cape Charles and there was every reason to believe that the bay could be reached in the ordinary course by seeking the channel with soundings. Expert witnesses on the libellant's part say that rather than let the ship go ashore, she should have been anchored. It is admitted that anchoring a ship under such circumstances is a last resort. It is questionable whether such a course was practicable when the ship was near the beach and whether the best hope of saving her even then was not to continue the towing and endeavor to work her off the beach. She was at the last so near the beach that it is doubtful if a sufficient scope of chain to hold her could have been given even if both anchors had been available and it would obviously have caused a loss of time and been dangerous to cut or unshackle the towing hawser from the ship's starboard chain and refasten it to the anchor when it was doubtful if she could hold with the port anchor. The experts in the case differ on this point and while there is much to be said, in view of what subsequently happened, in favor of anchoring, it seems to be the wisdom which comes after the results are known in a particular case. Situated as the tug was, I should not feel warranted in condemning her on this ground. It would seem that she was justified in going on until it was evident that the vessels were beyond the entrance to the bay. The ship had a high freeboard and was difficult to tow in a violent wind, such as prevailed at the time, and the difficulty was increased by the way she carried her yards, which probably accounted, in some degree, for the inability of the tug to get the desired heading after she had changed her course upon finding herself near the beach. None of the charges of fault set up in the libel, including the amendment, is proved. The tug remained by the ship until she herself touched bottom and then went to sea for her own safety, returning in the morning. In the meantime those on board of the ship had been rescued.

Apart from not making the Cape Charles Light, the tug had seemingly taken every precaution which her duty called upon her to exercise to ascertain that she was on a proper course to make the bay until it was discovered by the soundings, a little after 7 o'clock, that she was so near the beach. About this time Coston lights, indicating danger, were burned on the beach by some of the life savers from Cape Henry Station but then it was apparently too late to do anything except to try to pull the ship to sea. This the tug endeavored to do and probably would have been successful if the ship had co-operated with prudence and skill. The weather and the exposure of so much of the ship to the wind made it a hard undertaking for the tug but she did keep the ship away from the beach for several hours, and probably

would have succeeded eventually had it not been for the difficulty of towing the ship to sea when her yards were braced the wrong way.

It is urged by the libellant that the tug permitted the hawser to become slack and get under the ship's forefoot. There is a controversy upon this point, the ship contending as stated and the tug that she kept full speed ahead excepting when making the change to go to sea. I think the tug witnesses' statements that the engines were kept full speed ahead all the time after the turn to sea, except when momentarily slowed to prevent racing, are entitled to credence.

The tug doubtless made a mistake, as it turns out, in keeping on after the Cape Charles Light was not made. When the whistling buoy off Cape Henry was not made, the mistake was discovered and the master then endeavored to do what he probably should have done before, that is to go to sea, but the weather was such, in connection with the arrangement of the ship's yards, that he could not succeed. The liability of a towing vessel under such circumstances is described in The E. Luckenbach (D. C.) 109 Fed. 487, where it was said by Judge Brown (page 489):

"Even if the master made an error of judgment in not returning sooner, this is not the same thing as negligence, and negligence does not seem to me to be established by the testimony."

In affirming the District Court, the Circuit Court of Appeals said (113 Fed. 1018, 51 C. C. A. 589):

"PER CURIAM. The facts are quite fully stated in the opinion of the District Judge. In one respect his statement of them is fairly open to criticism. The testimony hardly warrants the finding that there was a sudden increase of wind; but we concur with him in the conclusion that the allegations of fault on the part of the tug are supported mainly by the wisdom that comes after the event. It would have been good judgment to stay in port. It would have been good judgment to turn back at Sewall's Point, when return was feasible and safe; but we are not prepared to say that in deciding to push on the master of the tug displayed such bad judgment as would amount to recklessness or negligence. * * * Although the storm had not finally broken, the wind had gone down very much before they started from the haven they had put into overnight, and according to the weather records it continued to fall much lower during the two hours ensuing their departure. The master made a mistake in pushing on beyond Sewall's Point, but we concur with the district judge in the conclusion that it was not an error of judgment so gross as to justify a finding of negligence. The decree is affirmed, with costs."

I conclude that the tug here exercised all of the skill and ordinary care which her duty required.

The libel is dismissed.